No. 84,813

STATE OF KANSAS, *Appellee*, v.
CHESTER L. HIGGENBOTHAM, *Appellant*.

(23 P.3d 874)

Opinion filed June 1, 2001.

*Virginia A. Girard-Brady*, of Lawrence, argued the cause and was on the brief for appellant.

*Mary A. McDonald*, special prosecutor, argued the cause, and *Carla J. Stovall*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant, Chester L. Higgenbotham, appeals his conviction of first-degree premeditated murder of Rhonda Krehbiel in Newton, Kansas. He contends that the trial court abused its discretion by admitting evidence of another murder he committed and by refusing to change the venue of his trial. We find no reversible error and affirm his conviction and sentence.

On May 20, 1994, Rhonda Krehbiel returned to Newton at approximately 2:10 to 2:20 p.m after accompanying her two daughters on a school field trip to Wichita. The kindergartners were dismissed to go home and the older children went back to class. Rhonda's daughter K.K., age 6, and a friend, D.G., age 5, went home with Rhonda.

On the way home, the group stopped by the home of Rhonda's mother to pick up Rhonda's youngest daughter. When no one was home at her mother's, Rhonda went to her own home. As they were eating ice cream and watching television, Rhonda answered a knock at the door. The children later related that Rhonda ap-

peared in the kitchen with a man who neither girl recognized. D.G. thought that Rhonda looked scared. According to D.G., the intruder was wearing a red baseball cap with a fish symbol. Rhonda told the girls to go into K.K.'s room, close the door, and play.

After the girls had been playing for awhile, K.K. went to her mother's room. She opened the door to see her mother lying on the bed with her hands and feet tied behind her and with a gag in her mouth. K.K. later told police that her mother was trying to say something to her but could not because of the gag. At that point, the intruder grabbed K.K., carried her back down the hallway to her room, and put both girls in the closet.

While they were in the closet, the girls heard the doorbell ring and heard banging on the front door of the house. The intruder opened the closet door and ordered the girls to be quiet. Later, K.K. heard seven to eight bangs which led her to believe that Rhonda had been shot.

Another of Rhonda's daughters, K.E.K., who was 8 years old at the time, walked home with a friend after school dismissed at 3:05 p.m., stopping first at a neighbor's house. When K.E.K. arrived home, she found the front door locked, which was unusual because her mother was always there to meet her after school. K.E.K. rang the doorbell and knocked but did not get an answer. After checking the sliding glass door in the back of the house and finding it locked, she and her friend went to a neighbor's house as they knew someone would be home there.

Sometime after 3:20 p.m., D.G.'s mother, Marla, arrived at Rhonda's house to pick up D.G. She found no one at home but saw K.E.K. and her friend playing in the neighbor's yard. K.E.K. and her friend wanted to go with Marla, so Marla left a note on Rhonda's door telling Rhonda that K.E.K. was with her. When Marla arrived home, she tried to call Rhonda but did not get an answer. She was worried and began to call others to try to find Rhonda. Eventually, she called Rhonda's husband, Von Krehbiel, who was at work in Wichita. He told her he would make some calls.

Von tried calling both of Rhonda's sisters and her mother. He talked to Kevin, the husband of one of Rhonda's sisters, and asked him to go to the house. Kevin drove to the house and went around

the back to where Von told him the spare key was kept. He noticed the sliding glass door was standing open. Kevin went inside the house and the telephone began ringing. The call was from Rick, the husband of another one of Rhonda's sisters. Kevin then looked in the garage and saw that the car was there. As he walked back through the house, the telephone rang again. This time it was Marla, who told Kevin that she had just sent her husband to the house. Kevin looked into the laundry room and noticed that Rhonda's purse was there. He proceeded into K.K.'s room where he found K.K. and D.G. in a closet. K.K. told him a man had put them there. Kevin started to go into Rhonda's room but reconsidered because of the children. Instead, he called 911 and reported that there was a possible intruder and he did not know if the intruder was still in the house. The 911 operator told Kevin to leave the house and he took the girls outside. The 911 call was logged at 4:25 p.m.

Officers entering Rhonda's bedroom found Rhonda's body nude from the waist down lying on the bed. Her wrists and ankles had been tied together behind her with a pair of pantyhose. White masking tape was sealed over her mouth and a white tube sock was knotted around her neck. She had been killed by multiple blows to the head from a blunt object which had fractured her skull. Her right eye was swollen and discolored and she had bruises on the inside of her mouth and on her legs. Pieces of her torn underwear were laying next to the body. Officers found a pair of sunglasses laying partially under the bed. A roll of masking tape similar to that used to seal Rhonda's mouth was found in the dresser along with pantyhose and white tube socks.

The case remained unsolved in September 1995, when police began to investigate the disappearance of Jonetta "Jodi" McKown. McKown, a resident of Wichita, was last seen at 1:30 a.m. on September 16, 1995, getting into a car registered to a man named Michael Murphy. It was discovered that Murphy was a fictitious name used by the defendant, Chester Higgenbotham.

Officers called the defendant, who lived in Newton. The defendant told them he had picked up a prostitute named Jodi and the two of them had driven around. The defendant told police he

had given Jodi $50 for her companionship and dropped her off near the bus station. Upon investigating the defendant's story, the officers discovered that the bus station was not open at the time the defendant stated he dropped Jodi off. Based on these findings, the officers traveled to Newton to question the defendant personally and executed a search warrant on his vehicle and house.

The defendant's wife, Vicki Murphy, was also questioned. She was not aware that her husband's real name was Chester Higgenbotham. She told police that on the morning McKown disappeared, she awoke early and became concerned because the defendant had not come home. She decided to see if she could find him. As she was driving by a storage unit the defendant had rented in Newton, she saw one of the defendant's cars parked at the unit. The defendant was there and she noticed a female in the front seat of the car. The female was slumped over in the seat and was not moving. When she asked the defendant about the female, he responded that it was "J.D. or a Jolene" and that she was just a friend of his who needed someone to talk to. The defendant told his wife to go back home and he would drop the female off and be home shortly.

When confronted with his wife's story, the defendant insisted to the officers that the person at his storage unit was not the Jodi that he had picked up earlier in the evening but, rather, her name was J.D. or Jolene. The defendant stated that he knew her from a bar in Newton and she had come by the storage unit after he stopped there to drop off car parts.

The defendant consented to a search of his storage unit. A wadded up piece of green duct tape with human hairs on it was found in a car parked in the storage unit along with a role of green duct tape, black plastic ties, and a white button.

On October 11, 1995, McKown's body was discovered in a rural ditch east of Newton. McKown was lying on her stomach with her hands and feet tied behind her with black plastic ties and nylon rope. There was another piece of rope around her neck. Her shirt was pulled down to her waist and her underpants had been removed and were laying by the side of her body. Green duct tape had been wrapped around her mouth and she had been gagged with a bandana. The black plastic ties used to bind McKown, as

well as the duct tape wrapped around her head, were similar to items found in the defendant's storage unit. The buttons on McKown's shirt also matched the button found in the unit.

McKown's body had decomposed, making it impossible to tell if she had sustained beating injuries. An autopsy concluded that McKown had died of asphyxiation, as there was no evidence of another cause of death and because the duct tape wrapped around McKown's head had covered both her mouth and her nose.

The defendant was eventually charged with and convicted of first-degree premeditated murder in McKown's death, and this court affirmed the defendant's conviction. See *State v. Higgenbotham*, 264 Kan. 593, 957 P.2d 416 (1998).

Detective T. Walton, who had worked on both the McKown case and the Krehbiel case testified that when he saw McKown's body he was immediately reminded of Rhonda Krehbiel's murder because McKown's body was bound in a similar fashion. After further investigation, police discovered that at the time of Rhonda's death, the defendant had been living in a halfway house three blocks away from her home.

Police also learned that a week before Rhonda's murder, Rhonda had attended a meeting of the Christian Women's Club at an inn in Newton. The club held meetings there on a regular basis and was normally given a reduced rate for meals. However, on that day the restaurant attempted to charge full price. An argument over the matter ensued between Rhonda, as treasurer for the group, and an assistant manager. That assistant manager was the defendant.

A woman who worked with the defendant at the inn testified that she had heard the defendant talk about Rhonda several times during the Christian Women's Club meetings. A baker at the restaurant testified that on the day of the defendant's altercation with Rhonda, the defendant came back into the kitchen and was very angry because he had to recalculate the bill. The defendant called Rhonda a "bitch" and slammed down a book and coffee mugs. Workers at the inn also testified that when composite sketches of the Krehbiel murder suspect were published in the newspaper, the defendant made numerous comments that the police did not know

who they were looking for or what they were doing regarding the murder, and that they would never find the real killer. Workers also informed police that the weekend after the murder the defendant came to work with a swollen eye.

The defendant's wife testified that she was dating the defendant at the time of Rhonda's murder. She stated that at the time, the defendant had a hat with a fish symbol.

The sunglasses found under the bed in the Krehbiel home were similar to a pair found in the defendant's storage unit. They were also similar to the kind the defendant's co-workers described him as usually wearing.

DNA testing was performed on the sunglasses found in the Krehbiel home. DNA was found on the sunglasses, and test results showed the defendant could not be excluded from the resultant profile. According to Shannon Stager, a DNA analyst, the chances that someone other than the defendant contributed the DNA found were one in 5.5 billion.

The defendant was ultimately charged with premeditated first-degree murder in the death of Rhonda Krehbiel. Prior to trial, the State filed a motion to introduce evidence of the defendant's conviction for the murder of McKown pursuant to K.S.A. 60-455. After a hearing, the trial court granted the motion and ruled that the evidence would be admissible to prove intent, identity, and plan.

After careful consideration, the trial court denied the motion to change venue. The defendant was convicted of premeditated first-degree murder, from which he now appeals.

## ADMISSION OF PRIOR CRIME UNDER K.S.A. 60-455

### Standard of Review

Our standard of review is succinctly stated in *State v. Lane*, 262 Kan. 373, 388, 940 P.2d 422 (1997):

"If the requirements for admission of evidence of prior crimes pursuant to K.S.A. 60-455 are met, the scope of appellate review is limited to whether the trial court abused its discretion. [Citation omitted.] Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion."

There is no dispute that the trial court found the following three requirements before admitting evidence of the defendant's prior crime: (1) the evidence was relevant to prove one of the facts specified in K.S.A. 60-455; (2) the fact was a disputed, material fact; and (3) the probative value of the evidence outweighed its potential prejudice. See *Lane*, 262 Kan. at 388. Thus, our standard of review is one of abuse of discretion.

Discussion

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

The trial court found that the evidence of the defendant's prior conviction was admissible to prove identity, intent, and plan. The defendant contends that the trial court erred because of the factual dissimilarity between the charged murder and the prior murder committed by the defendant. The State emphasizes the similarity between the two murders. The test to be applied is:

"Where a prior conviction is offered for the purpose of proving identity, the evidence should disclose sufficient facts and circumstances of the offense to raise a reasonable inference that the defendant committed both offenses. Similarity must be shown in order to establish relevancy. It is not sufficient simply to show that the offenses were violations of the same or similar statutes; there should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable inference that the same person committed both offenses. However, the prior offenses need only be similar, not identical, in nature." *State v. Blackmore*, 249 Kan. 668, Syl. ¶ 4, 822 P.2d 49 (1991).

The relevancy of prior crimes to prove intent also hinges on the similarity of the crimes. *State v. Dargatz*, 228 Kan. 322, 330, 614 P.2d 430 (1980). Likewise, in order to be relevant to prove plan, the crimes must be sufficiently similar to show a common ap-

proach. See *State v. Clements*, 252 Kan. 86, 90, 843 P.2d 679 (1992).

The two crimes at issue in this case contain many similarities. Both victims were tied with their arms and ankles drawn up behind their backs. Both victims had gags placed in their mouths with tape wrapped over the mouth area. Both victims had objects tied around their necks. The materials used to bind both victims were similar to those found in the areas where the victims were presumably murdered. Both victims were approximately the same height and weight. The panties of both victims had been removed and placed near the body. Both victims were only partially clothed.

The defendant contends that these similarities are superficial and argues that there were many dissimilarities, including the differences between the victims as Rhonda Krehbiel was a housewife and McKown was a prostitute, the differences in location of the killings as Rhonda was killed in her home in a forcible break-in and McKown went willingly, the differences between the condition of the panties as Rhonda's panties were ripped and torn and McKown's were intact, and the differences in the nudity of the victims as Rhonda was found nude from the waist down and McKown's body was found nude from the waist up. He also argues that while the manner in which the victims were tied was facially similar, it was not sufficiently shown that the masking tape, pantyhose, and tube socks used to bind Rhonda were the same as those found in the house.

While the crimes were not exactly the same, we conclude that they were sufficiently similar to raise a reasonable inference that the same person committed both offenses. The trial court did not abuse its discretion in finding that the prior crime was relevant to the present crime.

The defendant also contends that the prejudicial effect of the prior crime outweighs its probative value. Again, *Lane* provides guidance:

"Before prior crimes evidence is admissible under K.S.A. 60-455, the trial court must also find that the probative vale of the evidence—for the limited purpose for which it is offered—outweighs its natural prejudicial bias and that its prejudice

overbalances its contribution to the rational development of the case. *State v. Searles*, 246 Kan. 567, 579, 793 P.2d 724 (1990)." 262 Kan. at 391.

In addressing this question the trial court concluded:

"The probative value in this case, again, is of such importance that this Court believes that it overcomes the responsibilities not to offer evidence that would be prejudicial to the defendant's rights. The Court recognizes it will have to give very exacting instruction to the jury, in the way they can consider this particular evidence."

Thereafter, the trial court instructed the jury as follows:

"Evidence has been admitted tending to prove that the defendant committed a crime other than the present crime charged. This evidence may be considered solely for the purpose of proving the following: identity, plan and intent."

The importance of this relevant evidence where the defendant denied involvement is readily apparent. Evidence that the defendant committed another murder with some similarities to the murder with which he was charged contributed to the rational development of the State's contention that the defendant committed the murder. We note that the jury was limited by trial court instruction on the use of this evidence. See *State v. Lane*, 262 Kan. at 391; *State v. Falke*, 237 Kan. 668, 676, 703 P.2d 1362 (1985) (such instruction serves to minimize prejudice to the defendant). The decision to admit such evidence as more probative than prejudicial was not one with which no reasonable person would agree. We conclude that the trial court did not abuse its discretion in admitting under K.S.A. 60-455 evidence regarding the murder of McKown.

### CHANGE OF VENUE

#### Standard of Review

The determination of whether to change venue is entrusted to the sound discretion of the trial court, and its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. *State v. Cravatt*, 267 Kan. 314, 336, 979 P.2d 679 (1999). The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation but as a demonstrable reality. The defendant must show that such

prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial. 267 Kan. at 336.

Discussion

The defendant argues that the pretrial publicity surrounding his arrest as well as the research on community impact presented to the court demonstrated that he could not obtain a fair trial in Harvey County.

K.S.A. 22-2616(1) provides:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

In determining whether the atmosphere is such that a defendant's right to a fair trial would be jeopardized, courts have looked at such factors as the particular degree to which the publicity circulated throughout the community; the degree to which the publicity or that of a like nature circulated to other areas to which venue could be changed; the length of time which elapsed from the dissemination of the publicity to the date of trial; the care exercised and the ease encountered in the selection of the jury; the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; the connection of government officials with the release of the publicity; the severity of the offense charged; and the particular size of the area from which the venire is drawn. *State v. Jackson*, 262 Kan. 119, 129, 936 P.2d 761 (1997).

The defendant sought to establish prejudice through evidence of the large amount of media publicity surrounding the case. He presented a front page article from the newspaper in Newton relating how the Krehbiels' neighbors were relieved by the defendant's arrest, as well as a newspaper article containing a quote from that Harvey County Attorney that the possibility of a person other than the defendant matching the DNA profile from the sunglasses was "astronomical." He also presented a Wichita newspaper story

stating that he faced "Overwhelming DNA Evidence." Further, he presented evidence that the Newton newspaper voted the defendant's arrest its number one story for 1998, and Detective Walton was voted the top newsmaker of 1998 because his hard work and determination had "solved the murder."

It is clear that there was a great deal of media publicity surrounding the trial. However, we have held that "[m]edia publicity alone has never established prejudice per se." *State v. Ruebke*, 240 Kan. 493, 500, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987). In an attempt to show demonstrable prejudice, the defendant also presented a survey conducted by a litigation consulting firm. The survey pool was made up of 302 residents in Harvey County. The survey concluded that 95.7% of the individuals surveyed recalled the case after being given a brief synopsis, 60.6% of the individuals believed the defendant was either probably or definitely guilty, and 53% of the residents with knowledge believed that there was at least some evidence that the defendant was guilty. The survey also found that Ellis County would be similar in make up to Harvey County but did not have the same problems with regard to publicity and knowledge of the case.

Thomas Beisecker, a communications professor at the University of Kansas, testified as an expert in social influence regarding the survey. Beisecker concluded that the survey pool was sufficiently large to ensure an accurate sample. He felt it was particularly significant that 88.4% of the individuals contacted in Harvey County remembered at least one of the following facts: that the defendant was connected to another murder; DNA evidence linked the defendant to the murder; a reward had been offered for information about the Krehbiel killing; and the defendant was on parole and living in a halfway house at the time of the murder.

While the survey evidence is certainly impressive, this court has previously found no abuse of discretion in failing to change venue in other cases in which similar survey evidence was introduced. See *Jackson*, 262 Kan. at 129-30 (finding no abuse of discretion even though 82% of the respondents recalled at least some specifics about the incident and 60% thought the defendant was probably or definitely guilty); *State v. Swafford*, 257 Kan. 1023, 1035-36,

897 P.2d 1027 (1995) (using same survey, 57.1% of those surveyed felt the evidence was strong against the defendant); *State v. Anthony,* 257 Kan. 1003, 1013-15, 898 P.2d 1109 (1995) (finding no abuse of discretion even though 97.5% of those surveyed had heard of the case and 63.8% of those surveyed felt the evidence was strong against the defendant). In those cases, this court emphasized that there were no undue difficulties in empaneling a jury. *Jackson,* 262 Kan. at 132; *Swafford,* 257 Kan. at 1035-36; *Anthony,* 257 Kan. at 1014-15.

In the case at hand, the proceedings in voir dire are not in the record. Thus, it is impossible to determine whether there were any problems in picking a jury. A criminal appellant has the burden of furnishing a record which shows that prejudicial error occurred; in the absence of such a record, the appellate court presumes the action of the trial court was proper. *State v. Valdez,* 266 Kan. 774, 792, 977 P.2d 242 (1999). In any case, neither the defendant nor the State points to any problem with jury selection. That there was little trouble in picking a jury tends to support the trial court's conclusion that no change of venue was necessary.

Ultimately, the trial court made the following ruling with regard to the motion to change venue:

"The Court has heard a great deal of evidence and has listened carefully to that evidence and to the statements of counsel. The Court has also read a number of the cases from the Kansas Supreme Court . . . including the more recent *Jackson* case. The Court notes that in every case it has read, the Kansas Supreme Court has upheld a court's decision not to change venue, which places a great deal of burden upon this Court in that whatever decision this Court makes, in all probability, would be sustained. That's not absolute, of course, but with the vast number of cases having been sustained on refusals, this Court feels a great deal of responsibility in making this decision.

"The *Jackson* case indicates that the Court must consider cost. I don't think they meant it but this Court does consider cost. It takes into account the statements of the county attorney, recognizes that there would be a great deal of more expense to the county, but believes that that is so secondary to the main issue in this case, that the Court having considered it, would lay it aside without further comment.

"The real issue in this case, as I read all of the previous Kansas Supreme Court cases and particularly the *Jackson* case, is whether or not in the judge's discretion he finds that the prejudice of the community is so great that a defendant cannot

receive a fair trial from a fair and impartial jury selected in that county. With that issue before me, the Court must consider very carefully the survey that has been presented by the defense.

"I am satisfied that that survey was very carefully prepared and analyzed and its results are before this Court and there is no question that if we are measuring the amount of knowledge about this case on the part of prospective jurors in Harvey County, Kansas, there is a very high percentage of people that have media knowledge concerning this case. .

"Where the Court has a problem is attempting to transfer that knowledge of prospective jurors in this county to correspond and therefore conclude that those same prospective jurors, therefore have such a prejudice that this defendant could not receive a fair and impartial trial in this county.

"The Court has kept in mind throughout listening to these matters and considering this motion, the facts and it has been called to the Court's attention, that it is inherent in our constitutional form of rights to the defendant, that a trial of the case would normally have venue and jurisdiction where the offense took place. To overcome that great burden, the defendant must show, in this Court's opinion, not only widespread knowledge about a case, but a conversion of that knowledge into a prejudice on the part of the community so great as to keep him from receiving a fair and impartial trial.

"The Court weighs this after having heard part of the previous testimony, all of the testimony about the taking of the survey and the direct testimony about its analysis and has listened very carefully today to this evidence. And simply at this time, would have to find that it does not believe the defendant on this point has been able to sustain the burden of showing prejudice so great in this county and community, as to keep him from receiving a fair trial."

Reasonable persons could disagree with the trial court's determination in light of the extensive pretrial publicity and survey evidence. However, it cannot be said that no reasonable person would agree with the trial court's decision to deny the motion, especially given the lack of evidence showing any problems in selecting a jury. Under our standard of review, we conclude that the trial court did not abuse its discretion in denying the motion.

Affirmed.