No. 82,471

STATE OF KANSAS, *Appellee,* v. ROBERT L. VERGE, *Appellant.*
(34 P.3d 449)

Opinion filed November 16, 2001.

*Richard Ney* and *Bradley P. Sylvester,* of Wichita, argued the cause and were on the briefs for appellant.

*Jared S. Maag,* assistant attorney general, argued the cause, and *Alexander M. Walczak* and *John K. Bork,* assistant attorneys general, and *Carla J. Stovall,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is Robert Verge's direct appeal of his convictions of capital murder, K.S.A. 21-3439(a)(6), aggravated burglary, K.S.A. 21-3716, aggravated robbery, K.S.A. 21-3427, and two counts of theft, K.S.A. 21-3701. He was sentenced to life imprisonment with the possibility of parole after 40 years on the capital murder conviction, 68 months on the aggravated burglary conviction, 138 months on the aggravated robbery conviction, 14 months on the first felony theft conviction, and 14 months on the second felony theft conviction, with each sentence to run consecutively. Verge raises nine issues on appeal relating to venue, jury selection, evidence, prosecutorial conduct, upward departure, and constitutionality of sentence. He appeals directly to our court pursuant to K.S.A. 22-3601(b)(1).

*Factual and procedural background*

This is a companion case to *State v. Bradford*, 272 Kan. 523, 34 P.3d 434 (2001).

On February 17, 1997, around 6 a.m., a schoolteacher noticed two individuals carrying a flashlight walking down Solomon Road, north of the residence of Kyle and Chrystine Moore in Dickinson County, Kansas. She stated this was unusual and when returning home from work, she noticed the window of the Moore home was broken out. This report eventually led to the discovery of the slain bodies of Kyle and Chrystine Moore.

The investigating officers found blood stains in the living room, dining room, bathroom, and bedroom. The two victims were found dead in their bedroom. The bedroom had numerous blood impact stains on the walls and ceiling.

Kyle Moore died from gunshot wounds in association with blunt and sharp force injuries, showing he was beaten, stabbed, and shot. The number of wounds on his body totaled 102, some of which appeared to be defensive in nature and the result of a substantial struggle. The pattern of shots indicated that he was not moving at the time he was shot 10 times; however, he did still have blood pressure.

Chrystine Moore died from multiple gunshot wounds in association with stab wounds. She also had defensive wounds. Although she was stabbed numerous times, the wounds appeared to be treatable. She received several gunshot wounds to the head, some of which were "contact" wounds where the barrel of the gun contacted her skin. She was alive until the time when she was shot.

A knife wrapped in tissue paper, an empty handgun box, an empty handgun case, an empty ammunition box, and several .22 caliber shell casings were found at the Moore residence. DNA tests of blood stains found on the handgun box, a towel found in the bedroom, an invoice for one of the handguns found outside the residence, a leather jacket found in the victims' pickup truck, and the dash and vent of Kyle Moore's State-issued vehicle showed the blood to be consistent with that of Robert Verge.

Kyle Moore's State-issued vehicle was found in Kansas City, Missouri, parked outside of an apartment building. In the course of the investigation, the authorities became acquainted with one of the apartment residents, Charles Bostic.

Bostic testified for the State that he was a friend of Verge, and they grew up together. He stated that one morning in February 1997, Verge and Virgil Bradford came over to his apartment. The two looked like they had been up all night, and Verge had what appeared to be blood stains on his leather jacket and shoe strings. According to Bostic, Verge said they had just "killed some cops" and he motioned to Bradford to "show him." Bradford then lifted his shirt and displayed three handguns, which Bostic claimed were Verge's .38 caliber revolver, along with a .22 caliber and a 9 mm automatic.

In later testimony, Bostic stated Verge relayed the following sequence of events concerning the murders:

"He just said that they went up to the people's house, Virgil was supposed to have broke the window, they were supposed to have went through a window. They went upstairs, they was asleep, Virgil was supposed to have jumped on top of the man and start hitting him with his pistol. With the .38, supposed to start beating him with that. He put it like the man had a .22 on his night stand. He said the man went for his gun. Robert said he wrestled it out of the man's hand.
. . . .

"Then he said the woman was supposed to have woken up and he was supposed to have jumped over on top of the woman and grabbed her by the throat and started stabbing her, and Virgil was supposed to have said 'The bitch ain't dead, shoot her,' and he was supposed to have shot her."

Testifying in his own defense, Verge stated that after stopping in Solomon for gas, his car got stuck on a dirt road as he was trying to get back onto I-70. Verge stated that he and Bradford stopped at the Moore's house to ask directions back to the gas station and that as he was leaving, Bradford broke into the house to steal keys to a car. He said that he eventually followed Bradford in and saw Bradford beating up Kyle Moore. Verge testified he stood there in shock when he saw what Bradford was doing. After Kyle fell to the floor, Verge stated Bradford proceeded to stab Chrystine Moore until she was incapacitated. Verge testified that he started looking for car keys and while he was doing that, he heard Bradford shooting the Moores. After Bradford shot them, Verge and Bradford found the keys and left in the Moores' truck. Verge was driving the truck and again became stuck in the muddy road. The two returned to the Moores' house and this time took the Moores' other car and drove it to Kansas City.

Verge was convicted of one count of capital murder for the premeditated and intentional killings of Kyle and Chrystine Moore as part of the same act or transaction, or in two or more acts or transactions connected together, or constituting parts of a common scheme or course of conduct pursuant to K.S.A. 21-3439(a)(6). Verge was also convicted of aggravated burglary, aggravated robbery, and two counts of theft. The jury declined to assess the death penalty, and Verge was sentenced as previously stated. We next consider the issues he raises in his appeal.

*Change of venue*

Verge first contends the trial court abused its discretion in failing to grant his motion for change of venue, based on (1) results of the defense venue study, (2) alleged unqualified potential jurors in the venire, (3) racial prejudice in the community as reflected on the juror questionnaires, (4) potential juror knowledge of sensitive and sometimes false information concerning the case, (5) the trial

court's failure to apportion any weight to the defense venue study, and (6) the trial court's refusal to allow a defense expert witness to give his opinion on whether a fair jury could be impaneled from the Dickinson County pool.

We stated our standard of review for motions to change venue in *State v. Deiterman*, 271 Kan. 975, 978, 29 P.3d 411 (2001):

" 'The determination of whether to change venue is entrusted to the sound discretion of the trial court; its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. [Citation omitted.] The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality. The defendant must show that such prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial. [Citation omitted.]' *State v. Anthony*, 257 Kan. 1003, 1013, 898 P.2d 1109 (1995)."

Additionally, we held in *State v. Lumbrera*, 252 Kan. 54, 57-58, 845 P.2d 609 (1992), relying on *State v. Sanders*, 223 Kan. 273, 280, 574 P.2d 559 (1977), that the State is not required to produce evidence refuting that of the defendant.

Verge's motion to change venue filed pursuant to K.S.A. 22-2616 was based on a study prepared by Litigation Consultants, Incorporated, which compared opinions of 300 jury eligible residents of Dickinson County with 401 jury eligible residents of Sedgwick County. The preparers of the survey admitted the areas were different because one was rural and one was urban. The questions asked suggested answers and did not allow an answer of "no opinion." The results were testified to reveal that 96.7% of the Dickinson County residents could recall the case, 71.7% had talked about it, 64% believed Verge was either definitely or probably guilty, 39% believed there was a lot of evidence against him, and 5.4% believed there was overwhelming evidence. 71.4% believed Verge should receive the death penalty if convicted. A parallel survey done in Sedgwick County revealed a jury pool much less knowledgeable.

The State presented a separate survey that found 58% of those surveyed had not formed an opinion about the case.

Dr. Thomas Beisecker testified as an expert and opined the methodology used by the consulting firm was sound and adequate to reflect the potential jurors in both counties.

The trial court denied Verge's motion to change venue, holding he failed to carry the burden to show prejudice which would prevent a fair and impartial jury from being selected. The court found there was no showing of prejudice from the media coverage, that polling neither separated the issues in the mind of the people who responded nor showed that prejudice was such that a fair trial could not be obtained. The court, apparently looking at the State's poll, stated: "Now, at least half the people in Dickinson County, according to these surveys, have not formed an opinion as to the guilt or innocence of the defendants."

Strikingly on point is this court's recent decision in *State v. Higgenbotham*, 271 Kan. 582, 23 P.3d 874 (2001). There, the defendant complained of inflammatory publicity and presented a survey similar to the one in this case. The same expert, Dr. Beisecker, testified in the *Higgenbotham* case. Our *Higgenbotham* opinion stated:

"The survey pool was made up of 302 residents in Harvey County. The survey concluded that 95.7% of the individuals surveyed recalled the case after being given a brief synopsis, 60.6% of the individuals believed the defendant was either probably or definitely guilty, and 53% of the residents with knowledge believed that there was at least some evidence that the defendant was guilty. The survey also found that Ellis County would be similar in make up to Harvey County but did not have the same problems with regard to publicity and knowledge of the case." 271 Kan. at 593.

Our *Higgenbotham* opinion noted that we have not found abuse of discretion for not changing venue in other cases:

"See [*State v.*] *Jackson*, 262 Kan. [119,] 129-30[, 936 P.2d 761 (1997)] (finding no abuse of discretion even though 82% of the respondents recalled at least some specifics about the incident and 60% thought the defendant was probably or definitely guilty); *State v. Swafford*, 257 Kan. 1023, 1035-36, 897 P.2d 1027 (1995) (using same survey, 57.1% of those surveyed felt the evidence was strong against the defendant); *State v. Anthony*, 257 Kan. 1003, 1013-15, 898 P.2d 1109 (1995) (finding no abuse of discretion even though 97.5% of those surveyed had heard of the case and 63.8% of those surveyed felt the evidence was strong against the defendant)." 271 Kan. at 593.

Verge had compiled a study based upon statistics on 110 of the more suspect prospective jurors, showing their familiarity with the crime and their potential inability to properly decide a death pen-

alty case, as well as some who showed signs of racial prejudice. In a second motion to the court, Verge asked that the venue be changed based on these statistics.

The trial court again denied the motion, stating there may be some jurors who fit into several categories, no single question disqualified a majority and, after removing clearly unqualified jurors, there would still be a substantial number remaining from which to select a fair and impartial jury.

Out of the 174 individuals included on the venire, approximately 119 were interviewed before the necessary 36 were passed for cause. Twenty-one were excused for knowledge, a substantial number were excused for reasons such as health and work concerns, and a small percentage were challenged and dismissed for racial prejudice. Fifteen of the 36 venirepersons remaining in the jury pool prior to peremptory challenges had been challenged for cause by the defense, but only 4 were due to proximity of the jurors to the crime scene or victims; the other 11 were based on other factors.

Out of the final 12 selected for the jury, none had any familiarity with the victims or their families. Each one answered affirmatively the question "If you were sitting in the place of the defendant, Robert Verge, charged with the same offenses, would you be willing to have a juror in your present frame of mind sit in judgment on your case?" The great majority were from the surrounding towns in Dickinson County who knew little about the basic facts of the case. The record reflects that Verge was provided a jury free from community influence.

In the past, we have not relied on statistics but, rather, we have focused on the difficulties encountered in impaneling a competent and unbiased jury. In *Higgenbotham*, we stated that in *Jackson*, *Swafford*, and *Anthony*, the respective defendants did not experience undue difficulties in impaneling their juries, under facts comparable to our present case, as well as those faced in *Higgenbotham*. Additionally, there was no administration of death penalty nor racial discrimination issues in the *Higgenbotham* case. The selection of the jury in this matter took some 4 ½ days which while lengthy is not unduly extensive in a case of this difficulty. We pre-

viously stated in *State v. Grissom*, 251 Kan. 851, 928, 840 P.2d 1142 (1992), that the denial of a motion to change venue in a case was not unreasonable where it took 4 days to complete and pick a jury.

Additionally, there was not sufficient publicity to establish prejudice nor was any false information published in the community that affected jury selection. There were extreme statements relating to publicity made by several potential jurors, but we have previously held that media publicity alone never establishes prejudice. See *State v. Ruebke*, 240 Kan. 493, 500-01, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

Verge has not shown that a real problem concerning racial prejudice existed in the Dickinson County jury pool different from any other counties. Several potential jurors were stricken for cause on this complaint, but the number overall does not factually support the claim for change of venue.

The trial court considered Verge's venue study, but also was justified in giving consideration to the State's surveying process, which had different results.

Verge's final contention that his expert was unable to give his opinion as to whether a fair jury could be empaneled is without merit. This was not within Dr. Beisecker's area of expertise and was an attempt to invade the province of the court in opining as to the ultimate issue to be decided. The evidence clearly shows that the jury selection process was lawful and proper and resulted in a fair and impartial jury. Based on all the reasons previously set forth, we hold the trial court did not abuse its discretion in overruling the motions for a change of venue. We hold Verge's request for a new trial based on the lack of change of venue must be denied.

*Failure to excuse prospective jurors for cause*

Verge contends the trial court failed, as required under K.S.A. 22-3410(2)(i), to remove numerous jurors for cause because there was doubt that they could act impartially and without prejudice to the substantial rights of any party. We have held we will not reverse a ruling of the trial court under this claim absent a showing of abuse of discretion or unless the decision was clearly erroneous. *State v.*

*Dixon*, 248 Kan. 776, 788-89, 811 P.2d 1153 (1991). We have also stated: "[T]he trial court is in a better position than this court to view the demeanor of prospective jurors as they are questioned." 248 Kan. at 788.

Verge's contention relates to 15 potential jurors whom he alleges should have been discharged for cause. However, both sides agree that Verge used 12 of his peremptory challenges to strike objected-to venirepersons and the State struck 2 of the potential jurors about whom Verge complains.

Verge argues that because he was forced to use his peremptory challenges to remove these complained-of jurors, he was denied his full panoply of rights afforded to him under Kansas law and he should be granted a new trial. In support he cites a Ninth Circuit Court of Appeals opinion. That opinion was recently overturned by the United States Supreme Court. See *United States v. Martinez-Salazar*, 146 F.3d 653 (9th Cir. 1998), *rev'd* 528 U.S. 304, 145 L. Ed. 2d 792, 120 S. Ct. 774 (2000).

Verge's argument has been considered by this court and denied in *State v. Plaskett*, 271 Kan. 995, 1029, 27 P.3d 890 (2001); *State v. Donesay* 270 Kan. 720, 725-26, 19 P.3d 779 (2001); and *State v. Manning*, 270 Kan. 674, 690-95, 19 P.3d 84 (2001).

In these cases, the defendants contended they were denied due process by being forced to use peremptory challenges to strike clearly unqualified jurors. However, the defendants chose to exercise their challenges to strike the questionable venirepersons, and we found no reversible error. We need not restate our previous clear holdings on this issue.

It is thus clear as to all but one of the potential jurors that no possible prejudice existed due to their absence from the final jury panel.

One veniremember of whom Verge complains did remain on the jury and in fact became its foreman. Verge complains that this juror should have been excused because he felt African-Americans had a propensity for violence. We need not recite the entire questioning, but it is clear that this juror's answers to questions concerning violence and African-Americans related only to societal situations and depended upon the atmosphere, nurturing, and rais-

ing of the individual. It should also be noted that this juror stated he was not in favor of the death penalty, but agreed this did not disqualify him from being a juror. In denying the motion to excuse for cause, the trial court stated that considering societal issues concerning the defendant's background was not sufficient to sustain a challenge for cause.

Verge characterizes these statements as being racial and claims he is entitled to a jury free of such individuals. He relies on *Georgia v. McCollum*, 505 U.S. 42, 58, 120 L. Ed. 2d 33, 112 S. Ct. 2348 (1992), *Alexander v. Commonwealth*, 862 S.W.2d 856 (Ky. 1993), *Farias v. State*, 540 So. 2d 201 (Fla. Dist. App. 1989), and *People v. Blyden*, 55 N.Y.2d 73, 432 N.E.2d 758 (1982).

The *McCollum* opinion found that defendants cannot use peremptory challenges to eliminate jurors solely based on race, which is totally distinguishable from our situation. 505 U.S. at 58-59. In *Alexander*, the Kentucky Supreme Court found that the trial court abused its discretion by refusing to strike a juror for cause who stated that she did not like interracial marriages and would consider less credible the testimony of a witness married to someone of a different race. 862 S.W.2d at 864-65. In *Farias*, it was held the trial court erred in the trial of a Hispanic when it refused to excuse a venireperson for cause who outrightly tied the influx of crime and drugs with the entrance of the Latin community into the country. 540 So. 2d at 202-03. Finally, in *Blyden*, the New York Court of Appeals found the trial court erred in refusing to excuse a potential juror who openly expressed to the court his dislike for minorities. 55 N.Y.2d at 78-79. None of these decisions strike even close to the facts of our present case.

The potential juror in question was indifferent to interracial marriage. He believed that racism is a problem in Kansas but expressed that he had no negative feelings toward African-Americans and had never been afraid of someone of a different race. He explained during voir dire that he did not believe different races were innately disparate, and his answer was solely based on societal and environmental factors. His testimony was correctly viewed by the trial court, which ruled he should not be dismissed for cause. Verge has failed to show that the inclusion of the potential juror in question

in the jury prejudiced him in any way. This issue is without sufficient merit to require a new trial.

*Sufficiency of evidence to support conviction of capital murder*

Verge next argues the evidence is insufficient to show that he premeditated the killings of Kyle and Chrystine Moore.

When reviewing the sufficiency of the evidence in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000).

We recently restated our standard of review for premeditation in *State v. Alvidrez*, 271 Kan. 143, 148, 20 P.3d 1264 (2001), in this manner:

> "Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 (1997). Premeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one. In such a case, the jury has the right to make the inference. *State v. Buie*, 223 Kan. 594, 597, 575 P.2d 555 (1978)."

We further said in *State v. Henry*, 263 Kan. 118, 130, 947 P.2d 1020 (1997):

> "We held in [*State v.*] *Moncla* [, 262 Kan. 58, 73, 936 P.2d 727 (1997)] that while the element of premeditation is not inferred from use of a deadly weapon alone, an inference of premeditation may be supported where additional circumstances are shown, including lack of provocation, conduct before and after the killing, or the striking of a lethal blow after the deceased was rendered helpless."

The evidence in the present case clearly shows premeditation and is sufficient to uphold the capital murder conviction. Both victims were within the security of their own residence at the time of the brutal attack. Nothing shows they provoked their attackers in any way. The forensic pathologist testified that both victims were shot, which ensured their deaths, after they were incapacitated. The number of wounds and bullet wounds were aggravated in number raising a strong showing from which the jury could have reasoned the murders were premeditated.

Verge's argument appears to rest on a faulty presumption that where two individuals commit a heinous crime leaving substantial evidence but no eyewitnesses, they can blame each other, and the evidence will not support the conviction of either. Such a belief and presumption is completely misguided.

In addition, the testimony of Bostic confirms Verge's role as one who participated in the stabbing and shooting of Chrystine Moore. While Verge would ask this court to disregard the testimony of Bostic because of the many changes in his stories and conflicts, "[i]t is not our function to reweigh the evidence or judge the credibility of witnesses." *State v. Chaney*, 269 Kan. 10, 20, 5 P.3d 492 (2000).

Verge argues the physical evidence contradicts a witness' testimony and the physical evidence controls. Evaluating the evidence is not our responsibility but that of the jury, and when we view the evidence, we are directed to do so in the light most favorable to the prosecution. When viewed in this manner, the evidence is sufficient to uphold the jury's conviction of capital murder and the implicit finding of premeditation.

*Prosecutorial misconduct during closing argument*

Verge next contends the prosecutor committed reversible error by commenting about Verge's failure to produce other witnesses who were present at the time Bostic said he heard Verge's admission to the murders. Our standard of review for prosecutorial misconduct was recently stated in *State v. Deiterman*, 271 Kan. 975, 987, 29 P.3d 411 (2001), in this manner:

> "The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. [Citations omitted.]"

During cross-examination, defense counsel accused Bostic of lying. During closing arguments, he attacked Bostic's testimony that

Verge made incriminating statements to him and three other individuals in a parked van, stating:

"Part of Bostic's statements say, 'Well, I was in the van, too, and I heard all of these terrible incriminating statements. I was with Ducky, I was with Wes, and I with Larry.' Larry White, Wes—Wes Coleman, I believe—and Ducky Anderson. He's with these three people in the van that he associates with, and where are they? Where are they to corroborate that Bostic was telling the truth? I don't know. We haven't heard what they have to say, have we? Did they hear something in the van?"

In response to these comments, the prosecutor in closing stated:

"They say there were other people in the van, why aren't they here? You could imagine the difficulties in getting them—[Defense objects.] In getting people here from the inner city in Kansas City—[Defense objects again.] And the point is these witnesses were not unavailable to the defendant, either. [Defense objects again.] Mr. Ney and Mr. Sylvester are two fine attorneys, and if there's people that can help their client, they know how to get them in here. [Defense objects again.]"

After the jury retired, defense counsel moved the court to instruct the jury to disregard the noted comments of the prosecution, contending that Larry White was in the courthouse at the time of the trial and could have been called as a witness by the State. Additionally, it was contended that the State had interviewed all of the potential witnesses to Verge's alleged admissions and could have called any of them. Without taking a response, the court ruled it would be improper to give the jury any further instruction with regards to the arguments of counsel beyond the general instruction already given and denied the motion.

This issue again brings to us the long-time friction between counsel for the prosecution and the defense over the failure to bring forth testimony which it is contended would be favorable or unfavorable as the case may be.

Our cases have generally held that comments in response to questions of why the prosecution did not call a certain witness allow the prosecution to equally respond.

For example, in *State v. Robinson*, 219 Kan. 218, 547 P.2d 335 (1976), the defendant, who was accused of rape, inferred during closing that the State did not produce the victim's clothing because

it would have been unfavorable. In response, the prosecution noted that the defendant could have brought the clothing items before the court had they been relevant and favorable to his case. In holding the comments to be within the bounds of appropriate conduct, our opinion stated:

"Here, the prosecutor's remarks were certainly not inflammatory. They were invited by defendant's closing argument. Defense counsel argued that the state had failed to introduce in evidence the clothing of the victim, and inferred that such evidence would have been favorable to the defendant. The state simply responded that the defense could also have caused the clothing of the victim and of the defendant to be produced at trial had the defense wished to do so. The argument was not in anywise a reference to defendant's failure to testify. The clothing in question could have been identified by others, by the victim and by the arresting officer. The failure of a party to produce available evidence may give rise to an inference that it would be adverse to the party who could have produced it. *State v. Wilkins*, [215 Kan. 145, 147, 523 P.2d 728.] This applies equally to the prosecution and the defense.

". . . There is no prejudicial error where the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel. [Citations omitted.]" 219 Kan. at 221.

Similar arguments and holdings are found in *State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 (1991), and *State v. Hanks*, 236 Kan. 524, Syl. ¶ 7, 694 P.2d 407 (1985).

The comments by the prosecutor in this case were not inflammatory. They were merely invited by Verge's attempt to infer that the testimony of other individuals present during his alleged confession would not have confirmed Bostic's version of the event. Further, the allegation that one of those witnesses was under the control of the State and not available to Verge was in no way supported by the record. It appears in reality that each party was reluctant to call the individuals, who might or might not have testified as they were expected. This was not prosecutorial misconduct, and the prosecutor's response to Verge's invitation was justified under the facts of the case.

*Admission of multiple photographs of crime scenes and autopsies*

Verge argues several of the photographs of the Moores' bodies introduced during the trial were unduly prejudicial, repetitious,

and gruesome. He specifically challenges the introduction of 11 of the crime scene photographs.

The admission of photographs in a homicide case is a matter within the trial court's discretion, and the trial court's ruling will not be disturbed on appeal absent the showing of an abuse of that discretion. *State v. Reed,* 256 Kan. 547, 557, 886 P.2d 854 (1994). We have said: "While photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. [Citation omitted.]" *State v. Calderon,* 270 Kan. 241, 254, 13 P.3d 871 (2000). Further, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. *State v. Smallwood,* 264 Kan. 69, 83, 955 P.2d 1209 (1998).

In this case, Verge challenged the sufficiency of the evidence concerning premeditation. There were no eyewitnesses, and in order to show premeditation, the crime scene evidence was critical. The positioning of the bodies, blood stain patterns, and the wounds inflicted all contributed to the State's establishing the element of premeditation.

Verge's complaint as to the admission of exhibits 14 and 15, which were crime scene photographs of the victims from separate angles, was not raised by objection at trial and is, therefore, not an issue that can be raised for the first time on appeal. *State v. Saleem,* 267 Kan. 100, 109, 977 P.2d 921 (1999).

In *State v. Sutton,* 256 Kan. 913, 889 P.2d 755 (1995), photographs of the body as found at the crime scene, as well as the ones taken during the autopsy were introduced into evidence. In challenging the photographs as being repetitious, we upheld their admission, stating: "In the present case, the photographs taken where the body was found were introduced to corroborate the testimony of a law enforcement officer who described the appearance of the body, the clothing, and the surrounding ground. The photographs

taken during the autopsy were used to corroborate and illustrate the testimony of the pathologist." 256 Kan. at 921. Much of this is shown in the present case.

Verge challenges exhibits 23 and 24 as being repetitious and gruesome. Both exhibits were crime scene photographs, taken after items were removed from the top of the victims' bodies. They were taken at slightly different angles from similar scenes but show movement of the victims by a third party and were not improper.

Verge presents a similar argument against the admission of exhibit 64 when compared with exhibits 72 and 73. These exhibits show different views of Kyle Moore's face and head and the front of his upper body, arms, and chest in photographs taken by the pathologist, Dr. Mitchell. They show additional injuries not shown in other exhibits and were the basis for an opinion by the pathologist as to the cause of those injuries.

Verge objected to exhibit 65, which was utilized along with exhibit 66 by Dr. Mitchell to illustrate the types of weapons used to inflict the injuries and the manner in which they were used. This was clearly proper.

Exhibit 67, along with exhibits 68 and 69, was utilized by Dr. Mitchell to demonstrate the extent of the injuries after Kyle's head and hair were cleaned. The exhibits are from different angles, and they do in fact demonstrate different injuries.

Exhibit 76 was objected to as being punitive when viewed with exhibit 77. These were photographs of Kyle's hand to illustrate the severity of the injuries and manner in which the injuries occurred, and they were utilized in Dr. Mitchell's testimony.

Exhibit 85, a photograph showing the gunshot wounds to the head of Chrystine Moore, was utilized by Dr. Mitchell to illustrate the path of the bullets and the cause of her death. Its admission was not improper.

Exhibits 87, 88, and 89 show the numerous gunshot wounds to Chrystine's head and the lacerations caused by knife injuries. They were properly utilized in testimony of Dr. Mitchell.

Finally, exhibit 94, along with exhibits 95 and 96, shows stab wounds to other parts of the body of Chrystine and were used to

explain the manner in which the wounds were inflicted and that they were defensive in nature.

All of the pictures of the crime scene are gruesome, but these were terrible murders based upon multiple stabbing and bludgeoning injuries and numerous gunshots. The objections of the defendant to the exhibits cannot be upheld. The trial court did not abuse its discretion in allowing sufficient photographs to show the crime scene and for the pathologist to use in testifying as to the causes of death. All of the exhibits were correctly introduced.

*Use of defendant's pre-*Miranda *statements to police for impeachment purposes*

Verge next contends his statements to officers in Kansas should not have been used against him for impeachment purposes because he was not provided legal counsel during his extradition hearing from Missouri. He argues that had legal counsel been provided he would not have made any additional statements to law enforcement officials. Verge's argument that he did not properly waive his right to counsel during the extradition hearings in Missouri is factually without merit because he was so informed of the right to counsel but declined. Additionally, he does not recognize that once he was delivered to the demanding state, proceedings in the asylum state can no longer be challenged. *State v. Mick*, 229 Kan. 157, 158, 621 P.2d 1006 (1981).

After a pretrial hearing in which it was found that his statements were voluntary but made without *Miranda* warnings, the trial court refused to allow the statements into evidence except for impeachment purposes. Once Verge testified, the trial court properly allowed the statements to be used. This was appropriate under *State v. Roberts*, 223 Kan. 49, 56-57, 574 P.2d 164 (1977), and subsequent cases, the most recent being *State v. Alvidrez*, 271 Kan. 143, 146, 20 P.3d 1264 (2001). This assignment of error is without merit.

*Upward departure*

Verge next contends that the upward durational departures on his aggravated robbery, aggravated burglary, and theft convictions were unsupported by substantial and compelling circumstances.

motion for upward departure, and the sentences were ordered to be run consecutively after he completed his life sentence.

This issue is governed by our recent decision in *State v. Gould*, 271 Kan. 395, 23 P.3d 801 (2001), where we held our existing upward durational departure scheme is unconstitutional. We looked to and followed United States Supreme Court decision *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), wherein we held: "*Apprendi* dictates our conclusion that Kansas' scheme for imposing upward departure sentences, embodied in K.S.A. 2000 Supp. 21-4716, violates the due process and jury trial rights contained in the Sixth and Fourteenth Amendments to the United States Constitution. Gould's sentences must be vacated and remanded for resentencing." *Gould*, 271 Kan. at 414. Likewise, Verge's upward durational departure sentences for the aggravated robbery, aggravated burglary, and theft convictions must be vacated and this matter must be remanded for resentencing.

*Is the Kansas hard 40 sentencing scheme unconstitutional?*

Verge argues that the Kansas hard 40 sentencing scheme violates the guarantees of the Sixth and Fourteenth Amendments to the United States Constitution, as well as § 5 of the Kansas Constitution Bill of Rights. Since the filing of his brief, the constitutionality of the hard 40 sentencing scheme has been considered and upheld in response to the exact arguments Verge makes herein. See *State v. Conley*, 270 Kan. 18, Syl. ¶ 3, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). Our decision has been subsequently affirmed by *State v. Lopez*, 271 Kan. 119, 142, 22 P.3d 1040 (2001). The arguments raised by Verge have been fully considered and answered in the above-stated opinions, and we will not repeat those discussions here.

*Trial court's imposition of the hard 40 sentence after jury refused to impose the death penalty*

Verge next contends that K.S.A. 21-4635 violated his due process rights and, therefore, is unconstitutional because the trial court was permitted to set aside the jury's determination that the mitigating

circumstances did not outweigh the aggravating circumstances. This contention is not tenable.

A brief review of the capital murder law and hard 40 sentencing scheme is helpful in understanding this creative argument. Prior to 1994, K.S.A. 21-4624 established the procedure for determining whether an individual would receive a hard 40 sentence when convicted of first-degree murder. See L. 1990, ch. 99, § 4. The statute required that in order for a jury to impose a hard 40 sentence, it had to unanimously agree that a statutory aggravating circumstance or circumstances existed, and that those circumstances were not outweighed by the mitigating circumstances. In 1994, the legislature amended the statute to apply to the administration of the death penalty rather than the hard 40 sentence; however, the balancing test of aggravating and mitigating circumstances was not changed. L. 1994, ch. 252, § 4.

In the same year, K.S.A. 21-4635 was passed. See L. 1994, ch. 341, § 6. That statute required the trial court to determine whether a defendant convicted of capital murder when the jury did not impose the death penalty should be required to serve 40 years of mandatory imprisonment. The balancing test for the death penalty was incorporated, except that the court need not find the existence of aggravating circumstances beyond a reasonable doubt. Just as the jury was required to determine whether the aggravating circumstances were outweighed by the mitigating circumstances, so was the court. However, K.S.A. 21-4635(c) expressly permitted the court to make findings concerning the aggravating circumstances and the ultimate balancing of the aggravating and mitigating circumstances that might be contrary to those made by the jury during the death penalty sentencing phase.

Verge was convicted of capital murder, but the jury could not unanimously agree to impose the death penalty; therefore, he fell within the language of K.S.A. 21-4635(a), which stated "[T]he trial court shall determine whether the defendant shall be required to serve a mandatory term of imprisonment of 40 years or sentenced as otherwise provided by law."

The trial court made the determination that the statutory aggravating circumstances existed and those circumstances were not out-

weighed by the mitigating circumstances. The court then imposed the hard 40 sentence pursuant to K.S.A. 21-4638.

Verge claims that the trial court, by balancing the circumstances presented to the jury yet coming to a different result, has usurped the role of the jury in violation of his due process rights. He cites no compelling authority but does analogize the court's action to the improper removal of a juror as discussed in *State v. Stafford,* 255 Kan. 807, 823-25, 878 P.2d 820 (1994). *Stafford* was decided under the previous statutory scheme which required a hard 40 sentence to be determined by a unanimous jury and is in no way applicable to our facts.

There are a myriad of differences between a jury's determination and that of a court. The jury had to find beyond a reasonable doubt that there were one or more aggravating circumstances. However, to impose the hard 40 sentence, the judge had to find proof of one of the aggravating circumstances only by a preponderance of the evidence. We need not repeat our analysis made in either *State v. Spain (Spain I)*, 263 Kan. 708, 714, 953 P.2d 1004 (1998), or *State v. Spain (Spain II)*, 269 Kan. 54, 4 P.2d 621 (2000), which is applicable here as it relates to the imposition of the hard 40 sentence. We specifically stated in *Spain I* that the rules and circumstances are different when the death penalty is not implicated. 263 Kan. at 709-10. Once the death penalty was not an issue, the trial judge's obligations were clearly and properly set forth and were lawfully exercised in this situation. The arguments of Verge fail. The hard 40 sentence was properly entered.

## CROSS-APPEAL

### Lack of jurisdiction

The State asks this court to respond to the question "Can the defendant be convicted and sentenced for the capital murder of Kyle and Chrystine Moore in violation of K.S.A. 21-3439(a)(6) and for the first-degree murder of Chrystine Moore in violation of K.S.A. 21-3401?" While this is an interesting question the issue is not properly before us.

When jurisdiction to consider a question on appeal is in issue, we have stated:

"The right of appeal is entirely a statutory right; no appellate review is required by the United States Constitution, *Griffin v. Illinois*, 351 U.S. 12, 18, 100 L. Ed. 891, 76 S.Ct. 585 (1955), or the Kansas Constitution, *State v. Smith*, 223 Kan. 47, 48, 574 P.2d 161 (1977). . . . The Supreme Court has only such appellate jurisdiction as is conferred by statute pursuant to Article 3, Section 3, of the Kansas *Constitution*, and when the record discloses a lack of jurisdiction, it is the duty of the Supreme Court to dismiss the appeal. *State v. Thompson*, 221 Kan. [165] at 167, [558 P.2d 1079 (1976)]; *State v. Mitchell*, 210 Kan. 470, 471, 502 P.2d 850 (1972); *State v. Shehi*, 185 Kan. 551, Syl. ¶ 1, 345 P.2d 684 (1959)." *State v. Ji*, 255 Kan. 101, 102-103, 872 P.2d 748 (1994).

Also, "[a]n appellate court has the duty to question jurisdiction on its own initiative. If the record shows lack of jurisdiction for the appeal, the appeal must be dismissed." *State v. Snodgrass*, 267 Kan. 185, 196, 979 P.2d 664 (1999).

The notice of cross-appeal filed by the State states it is appealing (1) the judgment of the district court on December 19, 1997, "that the initial indictment in [this] case charging two counts of Capital Murder based on the killing of two individuals was multiplicitous and violated the double jeopardy clause of the Fifth Amendment," and (2) the judgment of the district court on September 18, 1998, "that the State could not amend its complaint by adding one count of premeditated first degree murder." The stated statutory authority upon which the State contends it has the right to appeal was K.S.A. 22-3601(b)(1).

Jurisdictional deficiency appears on the face of the notice of appeal, as K.S.A. 22-3601(b)(1) only expresses what appeals are to be taken to the Kansas Supreme Court and provides no statutory authority for the appeal taken by the prosecution in this case. As we said in *State v. Woodling*, 264 Kan. 684, Syl. ¶ 2, 957 P.2d 398 (1998): "Grounds for jurisdiction not identified in a notice of appeal may not be considered by the court."

In *State v. Kerby*, 259 Kan. 104, 106, 910 P.2d 836 (1996), the notice of appeal by the State was filed pursuant to K.S.A. 22-3603 (interlocutory appeals), and we dismissed the appeal, even though it was later contended that what was intended was to appeal a question reserved under K.S.A. 22-3602. In our case, the State is before us based on claimed statutory authority that is insufficient to state the grounds upon which the appeal is based. As Justice

Abbott stated in Kerby: "In *State v. G.W.A.*, [258 Kan. 703, 705-07, 906 P.2d 657 (1995)], this court found that the State's notice of appeal was not sufficient because the court was required to search through the record to determine what the State's appeal was actually based upon. This is what the State required the court to do in these appeals." 259 Kan. at 106. Our situation is similar.

Even if the recitation of the two specific dated orders is somehow deemed sufficient so this cross-appeal could be considered a K.S.A. 22-3602(b)(3) appeal "upon a question reserved by the prosecution," there was clearly no proper and timely objection or stated reservation of the right to appeal by the prosecution as is required by *State v. G.W.A.*, 258 Kan. at 705-07.

Finally, as Verge argues, an examination of the trial court's ruling of September 18, 1998, shows the State was not prohibited from filing a motion to amend and only held that if it did so, the issues would differ and another preliminary hearing would be necessary. The State elected to proceed based on the complaints as were then filed. This action gives no basis for appeal.

We have no jurisdiction to consider the State's cross-appeal and it is dismissed.

Convictions affirmed, sentences vacated in part, and case remanded for resentencing in accordance with this opinion.