(282 P.3d 643)
No. 105,558

STATE OF KANSAS, *Appellee*, v. PAUL H. PARKER, JR., *Appellant*.

Opinion filed August 10, 2012.

*Meryl Carver-Allmond*, of Kansas Appellate Defender Office, for appellant.

*Christina Trocheck*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., PIERRON and LEBEN, JJ.

LEBEN, J.: Paul H. Parker Jr. appeals his convictions for rape and other charges because he says the district court should have moved his trial from Salina to another location due to pretrial publicity. He also contends that the district court should have ordered a public-opinion survey from public funds in support of his request to move the trial.

But an appellate court reviews these rulings only for an abuse of discretion. And even though the rape of a 94-year-old hospitalized woman understandably received widespread media attention, the district court instituted special measures for jury selection that

resulted in the selection of a fair and impartial jury without undue difficulty. We therefore find no abuse of discretion.

Parker also claims that the district court made several other errors during his trial. We have considered each of them but find no error, so we affirm Parker's convictions.

## FACTUAL BACKGROUND

To set the stage for our discussion of the legal issues, we first must go through the facts in some detail. Because we must take the facts in the light most favorable to the jury's verdict on some issues, such as whether the evidence was sufficient to convict Parker, we will begin with the version of events presented by the victim, investigating officers, and witnesses other than the defendant. Later, we will also review what the defendant said took place.

The events relevant to this case began on the evening of February 20, 2010, at the Salina Regional Health Center. E.A.—a 94-year-old woman—was recovering from surgery. At the time, she couldn't walk without assistance and had substantial swelling in her left leg. During her surgery, surgeons had made incisions in her groin, and she felt "very weak."

After visiting hours were over, a man that E.A. had never seen before entered her room. She described him as heavyset, not terribly tall, "black, but not black," with dark skin and closely cut hair; she would later identify that man as Parker. Parker sat down in E.A.'s room and chatted with her. E.A. assumed that Parker was a therapist, although Parker never said that he was.

After a nurse left the room, Parker got up and closed the door. Parker sat on the edge of the bed and rubbed E.A.'s swollen left leg. Then he touched, agitated, and penetrated E.A.'s vagina with his finger. E.A. testified that the contact hurt and was rough. She denied giving Parker any permission to penetrate her with his finger.

Parker then told E.A. to get up and lie on her stomach. E.A. protested, saying, "This isn't therapy." Parker tried unsuccessfully to penetrate her with his penis. Parker then exposed himself and told E.A. to fondle his penis, but she refused. Parker told E.A. to turn over on her hands and knees, and he unsuccessfully tried again

to penetrate her in that position. As E.A. described it, Parker then "mounted [her]." E.A collapsed under Parker's weight screaming, "You're killing me."

After collapsing, E.A. was lying flat on her stomach, and Parker was lying on top of her. For the third time, Parker tried unsuccessfully to penetrate E.A. with his penis. E.A. denied giving Parker permission to attempt to penetrate her with his penis.

At this point, a nurse entered the room and saw Parker on E.A.'s bed with his pants down. Parker told the nurse that he was from physical therapy and E.A. was his aunt. He jumped to the floor, pulled up his pants, and left the room.

Parker tried to leave the hospital, but he was physically restrained by various members of the hospital staff. Parker calmed down only when officers arrived and handcuffed him.

A sexual-assault nurse examiner swabbed Parker's hands for possible DNA evidence. All four swabs contained significant amounts of E.A.'s DNA. The DNA analyst believed that the large amount of E.A.'s DNA collected from the swabs was more consistent with vaginal secretions than mere skin-to-skin touching.

The same nurse gave E.A. a sexual-assault examination and found extensive bruising in E.A.'s groin area from the surgery and a laceration below her clitoris.

Before trial, Parker filed a motion to change venue, alleging that the extensive pretrial publicity in Salina was so great as to deny him an opportunity for a fair and impartial trial. To support the motion, Parker presented several newspaper articles covering the case—some of which reported on Parker's prior criminal history—along with anonymous reader comments from the Internet. The court denied the motion to change venue.

At a later hearing, the State orally asked the court to reconsider Parker's motion to change venue. The prosecutor expressed a concern that the case would be delayed if a jury could not be selected. After further consideration, the court once again denied the motion; the court said that reasonable measures could be taken to assure a fair and impartial jury.

Parker also filed a pretrial motion for expert services, requesting that the judge order the funding of a public-opinion poll "to sample

community sentiment and the likelihood Mr. Parker can obtain a fair trial before an unbiased and impartial jury in Saline County." The district court denied the motion, remarking that the poll would not be particularly helpful since the court planned to take additional measures in jury selection due to the pretrial publicity and "because the likelihood that those individuals that are polled are going to actually be on the panel that come[s] before the court is unlikely." In support of the motion, the Board of Indigents' Defense Services (BIDS) submitted an affidavit stating that it did not have the money to fund a public-opinion poll. During the hearing, the district court noted that Parker could proceed with a poll if BIDS chose to fund it or other funds were found that could be used: "[I]f you can get BIDS to agree to pay that, certainly, that's what you all can work out. Or if Mr. Parker or his family can afford to pay for that poll, they can pursue that. . . . Again, if you can get BIDS to pay for it, that's between you and them."

Written questionnaires sent in advance of trial were among the measures the district court chose to use to help in selecting an impartial jury. The parties agreed to send out the questionnaires to 100 potential jurors. Additionally, the parties agreed to use small-group interviews, with individual questioning (away from other jurors) on material facts. This way, if one potential juror mentioned information that could bias others, at most a small group would be disqualified.

Based on the responses to the questionnaires alone, the parties agreed to excuse 46 potential jurors out of the 100 who had returned questionnaires. The parties then agreed to mail additional questionnaires to a new group of 46 people. The parties agreed to excuse an additional 20 potential jurors from that group. In total, then, 66 of 146 (45%) potential jurors who filled out the questionnaires were released based on the potential for bias before the jury-selection process began in the courtroom.

Questioning of potential jurors in the courtroom then began with groups of 20 to 23 members. Three panels with a total of 66 potential jurors were questioned. A fourth panel was canceled, and all but 10 members of the third panel were released because the court had already qualified enough jurors (46) to seat a full jury of

12 plus 2 alternates (based on the number of peremptory challenges each side is allotted by law). Only a few additional jurors were excused for potential bias during questioning of the three panels. The district court commented on the relative ease it had in selecting the jury, noting that even those who had heard about the case or formed opinions "were readily able to admit that they were able to presume the defendant was not guilty, that he was innocent, and that they would be able to set aside what they had read and heard and readily agreed that they would base their decision upon the evidence presented."

During jury selection, Parker renewed his motion to change venue several times. In addition, Parker refused to pass any of the three small groups "for cause," something that is ordinarily done once a party has no more challenges to potential jurors based on specific claims of bias shown by individual jurors in answer to questions during the selection process. Parker's counsel conceded that he had no further for-cause challenges to individual jurors but still would not agree that he had no cause to object to the remaining potential jurors.

At trial, Parker made an oral motion to suppress the swabs of DNA collected from his hands, arguing that the DNA was obtained in an illegal search without a warrant or consent. In response, the State presented evidence that the officer who ordered collection of the swabs believed there was both (1) probable cause to believe a felony was committed and (2) exigent circumstances, circumstances that can justify a warrantless search. The officer explained that there were exigent circumstances because even though Parker was handcuffed, he still could have wiped his hand on his pants and destroyed possible DNA evidence before the officer could have obtained a warrant. The court found both probable cause and exigent circumstances, and it denied Parker's motion to suppress.

Parker testified that he had entered the hospital to use the restroom. He said he could not find a restroom until he reached the third floor and entered E.A.'s hospital room. Parker testified that after he noticed E.A. in the bed, he chatted with her and shook her hand. He insisted that this handshake was his only physical contact with E.A. Parker admitted that no one gave him permission

to enter E.A.'s hospital room. Parker also said that his sweatpants often fell down and that he had to pull his sweatpants up when he got up from the chair.

The district court instructed the jury that "[s]exual intercourse means any penetration of the female sex organ by a finger or the male sex organ. Any penetration, however slight, is sufficient to constitute sexual intercourse." The term "sexual intercourse" was used in the instructions on the charges of rape and attempted rape. For rape, attempted rape, and aggravated sexual battery, the State charged Parker with two different counts each—once under the theory that the victim was "overcome by force" and once under the theory that the victim was "physically powerless" to resist the offense. Each of the sex crimes required that the action was done "without the consent" of E.A.

The jury found Parker guilty on all charges—rape, attempted rape, aggravated sexual battery, battery, and aggravated burglary. Additionally, the jury unanimously found that because E.A. was particularly vulnerable due to her age, an aggravating sentencing factor had been established. The district court sentenced Parker to a controlling term of 1,240 months in prison.

Parker has appealed to this court.

## ANALYSIS

We will separately review each of the arguments Parker has raised on appeal. Before doing so, we note that the Kansas Criminal Code was recodified effective July 1, 2011. Because Parker's crimes occurred on February 20, 2010, we cite to the statutes defining each offense as of that date. See *State v. Denney*, 278 Kan. 643, 646, 101 P.3d 1257 (2004) (holding that criminal statutes in effect at date of crime govern).

I. *The District Court Did Not Abuse Its Discretion in Denying Parker's Motion to Fund a Public-Opinion Poll About the Effects of Pretrial Publicity.*

Parker's first argument on appeal is that the district court should have granted his motion to require that public funds be spent to obtain a public-opinion survey that would show what impact there

had been on potential jurors from extensive pretrial publicity about the case. The Board of Indigents' Defense Services (BIDS) declined Parker's request to fund that study, so Parker asked the court to order funding. Because Parker was indigent, his defense was paid for by public funds. He was represented by a salaried public defender, but out-of-pocket costs would be submitted to and paid for by BIDS.

A district court's decision on a motion to fund expert services for an indigent defendant is reviewed for abuse of discretion. *State v. Snodgrass*, 252 Kan. 253, 265, 843 P.2d 720 (1992); *State v. Haislip*, 237 Kan. 461, 484, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985). A district court abuses its discretion if its judgment is so arbitrary that no reasonable person would agree with it or if its ruling is based on an error of law or fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

A reasonable person could agree with the district court's decision. The court noted that it planned to take extra measures during jury selection to make sure that a fair and impartial jury could be found despite the extensive pretrial publicity. And the court worked with counsel for both sides to make that happen—first using written questionnaires to narrow down the potential jurors to an initial group that seemed untainted by pretrial publicity and then questioning them in greater detail usually in small groups, sometimes individually. The district court noted that it had no difficulty in qualifying a sufficient number of jurors, and no request by Parker to disqualify an individual juror for cause was denied. In similar cases, our Supreme Court has found no abuse of discretion in denying state funds for a pretrial public-opinion poll. See *Haislip*, 237 Kan. at 484-85 (finding no abuse of discretion in denying opinion survey when no significant difficulties were encountered at trial based on pretrial publicity and no challenge defendant made to strike an individual juror for bias was denied); *State v. May*, 227 Kan. 393, 396-97, 607 P.2d 72 (1980) (finding no abuse of discretion in denying opinion survey when jury selection took only 3 hours and no significant difficulties were encountered at trial based on pretrial publicity).

Parker argues that the district court "abandoned" its role and "completely left the decision up to BIDS." Were that the case, it would be an abuse of discretion. Discretion is granted to a trial judge so that decisions can be made based on appropriate considerations in a given case. And an abuse of discretion does occur if the judge refuses to exercise discretion or fails to appreciate the discretion he or she has. See *State v. Horton*, 292 Kan. 437, 440, 254 P.3d 1264 (2011). In support of this argument, Parker notes the comment the judge made that if BIDS agreed to pay, then Parker could have a survey. In our view, Parker misreads what took place at that hearing. The district judge concluded that a venue study wasn't needed, explaining that the court and the parties were already taking appropriate measures to account for pretrial publicity. The judge also said that an opinion survey wouldn't be particularly helpful. The judge didn't abandon his duty here to exercise discretion—he simply noted that BIDS was free to fund a study if it chose to, but the court wasn't going to order it to do so.

Parker also makes some legal arguments on this issue that we find off the mark. He argues that BIDS has a conflict of interest when it considers whether to grant funding for an expert. But whatever BIDS may do (or may have done here), Parker made a request to the district court to have it order the State to pay (through BIDS) for this public-opinion poll, and the district court exercised its discretion and denied the request. Parker also argues that his right to equal protection of the laws was violated because he says that Kansas statutes provide different standards for getting expert services for an indigent defendant depending upon whether a salaried public defender is involved or the defendant is represented by other counsel paid by the State. According to Parker, it's unconstitutional for a statute to allow direct access to the court to request expert services if the indigent defendant is represented by an attorney other than a public defender, see K.S.A. 22-4508, while the public defender must first apply to BIDS. But equal protection is not about "theoretical inconsistencies." *Railway Express v. New York*, 336 U.S. 106, 110, 69 S. Ct. 463, 93 L. Ed. 533 (1949). Even according to Parker's argument, all defendants have the ability to apply for a court order that a study like the one requested here be

funded at State expense. Parker has not shown any actual difference in treatment. See *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 315, 255 P.3d 1186 (2011) (noting that equal-protection claim rests on differing treatment of similarly situated individuals).

II. *The District Court Did Not Abuse Its Discretion in Denying Parker's Motion to Change Venue.*

Parker separately argues that the district court should have granted his motion to change venue, thus moving the trial to another community. The decision on a motion to change venue is another matter entrusted to the district court's discretion, and we do not reverse that decision unless there is an abuse of discretion that harms the defendant's rights to a fair trial. *State v. Higgenbotham*, 271 Kan. 582, 591, 23 P.3d 874 (2001); *State v. Krider*, 41 Kan. App. 2d 368, Syl. ¶ 1, 202 P.3d 722 (2009), *rev. denied* 289 Kan. 1283 (2010). Even so, in determining whether the district court has taken sufficient measures to make sure that the case is tried to an impartial jury, an appellate court must make an independent evaluation of the circumstances. *State v. Hayden*, 281 Kan. 112, 128-29, 130 P.3d 24 (2006).

K.S.A. 22-2616(1) provides that a change-of-venue motion must be granted "if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county." Kansas courts consider a number of factors in determining on appeal whether such a motion should have been granted. Those factors include the ease with which a jury was selected, the degree to which publicity had circulated to other parts of the state where the trial could have been held, the challenges exercised by the defendant during jury selection, whether government officials contributed to the pretrial publicity, the severity of the offense, and the size of the area from which jurors were drawn. *Higgenbotham*, 271 Kan. at 592; *Krider*, 41 Kan. App. 2d at 372. But media publicity alone is never enough to establish prejudice. *State v. Verge*, 272 Kan. 501, 508, 34 P.3d 449 (2001); *Krider*, 41 Kan. App. 2d at 372. And the defendant has the burden to show that prejudice

exists in the community, not as a matter of speculation but as a demonstrable reality. *Higginbotham*, 271 Kan. at 591-92; *Krider*, 41 Kan. App. 2d at 372.

Parker correctly notes that there was extensive pretrial publicity in the Salina media. He also notes that members of the public (though not necessarily from Salina) entered comments following stories on the *Salina Journal* website and that many of those comments showed bias against whoever committed the crime, a person many assumed to have been Parker. There was also mention in the media of Parker's past convictions, and some members of the public commented about that too.

But this doesn't show that fair jurors couldn't be found in Salina. Any reasonable person would react with revulsion and anger at the facts that were alleged (and ultimately proven) in this case—the rape of a 94-year-old woman who was recovering from surgery in a hospital room. That revulsion doesn't cloud every person's willingness to keep an open mind about what really happened and, if a rape took place, to keep an open mind about who committed it.

Parker is right that a significant number of potential jurors were biased against him: 45% of the potential jurors were eliminated due to apparent bias based on their written questionnaires. What Parker has not shown, however, is that he was unable to get a fair trial in Saline County. Jury selection went smoothly once potential jurors had passed the screening process of the questionnaires, and no request by Parker to excuse a juror for bias was denied by the district court.

Parker argues that the publicity here was so extensive that prejudice should be presumed and the sworn statements of potential jurors that they could be impartial should be disregarded. In support, Parker cites *Irvin v. Dowd*, 366 U.S. 717, 727-28, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961), a case in which 8 of the 12 jurors selected had said that they believed the defendant was guilty, and some jurors had said that they'd need evidence to overcome that belief, that they couldn't give the defendant the benefit of the doubt, and that they had a " 'somewhat' certain" fixed opinion. 366 U.S. at 728. Here, Parker points to only one juror actually selected who said he had "probably" formed an opinion but who also said

that he could set that aside and hear the case impartially. Even in a highly publicized criminal case, "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court," that's acceptable. 366 U.S. at 723. Notably, Parker neither asked to strike that juror for cause nor used one of his peremptory challenges to remove him.

Parker has not shown an inability to select a fair and impartial jury in Saline County. The district court effectively managed the jury-selection process so as to eliminate those who might be biased against Parker. The district court did not abuse its discretion by denying the motion to change venue. See *State v. Deiterman*, 271 Kan. 975, 978-79, 29 P.3d 411 (2001) (finding no abuse of discretion in denial of motion to change venue despite substantial pretrial publicity); *Higginbotham*, 271 Kan. at 593-95 (same); *Krider*, 41 Kan. App. 2d at 373-74 (same).

III. *There Was Sufficient Evidence That E.A. Didn't Consent to Parker's Actions, That She Was Overcome by Force, and That She Was Physically Powerless.*

Rape, attempted rape, and aggravated sexual battery all require that the act be done without consent. In addition, as relevant in our case, the victim must be overcome by force or be physically powerless to resist. See K.S.A. 21-3502(a)(1)(A), (B) (rape); K.S.A. 21-3518(a)(1), (2) (aggravated sexual battery); K.S.A. 21-3301(a) (attempt crimes). Here, the State charged each of the crimes in two separate counts. For the rape charge, for example, there was one charge of rape by force and a separate charge of rape in which the victim was physically powerless. The district court separately instructed the jury on each of those as separate counts, though the court ultimately entered only a single rape conviction, a single attempted-rape conviction, and a single aggravated-sexual-battery conviction.

Parker contends that the evidence wasn't sufficient for the jury to find lack of consent, force, or physical powerlessness. Because the jury is the fact-finder and it convicted Parker, we must look at the evidence in the light most favorable to the State and determine whether, viewed in that light, a rational fact-finder could have

found the defendant guilty beyond a reasonable doubt. See *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011).

*Lack of Consent*

Parker claims that E.A. consented to be treated by hospital staff and that she believed that he was a therapist. Thus, he argues, she consented to what he did.

But E.A. never consented to sexual contact by hospital staff, and she testified that she didn't consent to Parker putting his finger insider her or attempting to put his penis inside her—the acts that constituted rape and attempted rape.

The jury instructions said that Parker's rubbing of E.A.'s leg, touching her breast, or rubbing her vaginal area could constitute aggravated sexual battery. The jury's verdict concluded that Parker was guilty because he had rubbed her vaginal area and her leg. Arguably, had Parker been a therapist, E.A. might have consented to the therapeutic rubbing of her leg. But an additional element of aggravated sexual battery is that the act be done "with the intent to arouse or satisfy the sexual desires of the offender or another." K.S.A. 21-3518(a). There was no evidence that E.A. consented to anyone rubbing her leg to satisfy that person's sexual desires, which is what the jury found Parker did here. The jury could reasonably find that E.A. didn't consent to any of Parker's actions that were part of the charged crimes.

*Overcome by Force*

Parker contends that the evidence didn't show that E.A. was overcome by any force other than the force required to achieve penetration. Parker's argument highlights the elusiveness of any specific definition of the concept. Our Supreme Court has said that "[f]orce or fear within the definition of rape is a highly subjective concept that does not lend itself to definition as a matter of law." *State v. Tully*, 293 Kan. 176, Syl. ¶ 12, 262 P.3d 314 (2011); see *State v. Brooks*, 46 Kan. App. 2d 601, 613, 265 P.3d 1175 (2011), *rev. granted* 294 Kan. 944 (June 13, 2012).

Parker cites *State v. Hendrix*, 289 Kan. 859, 862, 218 P.3d 40 (2009), which defined force as physical contact—not just threats or displays of force. But *Hendrix* wasn't a rape case. Its discussion

related to the conclusion that a jury instruction on self-defense wasn't needed unless actual physical force was used and the crimes at issue were criminal threat and aggravated assault. But even if actual physical force is required, the State presented evidence that Parker "agitated" E.A.'s vagina before inserting his finger and that the contact hurt and was rough. In addition, E.A. suffered a laceration, collapsed under Parker's weight after he "mounted" her, and she screamed out, "You're killing me!" There was sufficient evidence for the jury to find that E.A. was overcome by force with respect to each of the crimes.

*Physically Powerless*

Parker claims that the evidence wasn't sufficient to show that E.A. was physically powerless because "[t]he ordinary meaning of the words 'physically powerless' would seem to be bodily immobile or without power." Whatever abstract meaning can be attributed to the words "physically powerless," we confront them in the context of a rape statute that forbids sexual intercourse without consent "when the victim is . . . physically powerless." K.S.A. 21-3502(a) (1)(B).

E.A. was 94 years old and recovering in a hospital from major surgery. She had been in the intensive-care unit the day before the attack. She couldn't walk by herself and was essentially bedridden. Additionally, Parker outweighed her by about 150 pounds, and E.A. testified that she couldn't have done anything to fight him. The ordinary meaning of "physically powerless" in the context of the rape statute doesn't require total immobility; it requires only a physical inability to resist the attacker. There was sufficient evidence to find that E.A.'s age, frailty, and weakness left her physically powerless to resist Parker, a man who was far bigger, stronger, and younger.

IV. *There Was Sufficient Evidence to Support Parker's Convictions for Rape and Attempted Rape.*

Based on the charges and the applicable statutes, the district court instructed the jury that it could find rape or attempted rape if E.A. was penetrated either by a finger or by the male sex organ. On the rape charge, Parker concedes there was evidence of finger

penetration but argues that that was no evidence of penile penetration. On the attempted-rape charge, he argues that there was no evidence of attempted penetration by a finger—only *completed* penetration by a finger. Thus, Parker contends that the State presented alternative means of committing these crimes but proved only one of two alternatives. He then contends that because the evidence wasn't sufficient to meet one of the alternative means, the rape and attempted-rape convictions must be set aside.

Parker is right that the statute provides that the penetration necessary to commit the crime of rape may be done by a finger or by a penis. K.S.A. 21-3501(1) defined sexual intercourse as "any penetration of the female sex organ by a finger, the male sex organ or any object," and K.S.A. 21-3502(a)(1)(A) defined rape generally as sexual intercourse without consent when the victim is overcome by force or fear. The jury instructions generally tracked these statutes to define sexual intercourse.

Parker is also right that when a statute defines a crime through alternative means, either of which might be committed, the jury may convict without agreement on which of the means took place so long as there is sufficient evidence to support each of the means. *State v. Wright*, 290 Kan. 194, Syl. ¶ 2, 224 P.3d 1159 (2010). But "alternative means" is a legal term of art, meaning the term has a specific meaning apart from its general usage—it is only when a statute creates "materially different" ways of committing a crime, *i.e.*, two or more truly "distinct ways of committing an offense," that there are alternative means for the purpose of an argument like Parker makes here. *State v. Johnson*, 46 Kan. App. 2d 870, Syl. ¶ 8, 265 P.3d 585 (2011). So we must first determine whether rape and attempted rape are alternative-means crimes in the way Parker contends.

Our court recently held in *State v. Schreiner*, 46 Kan. App. 2d 778, 783-84, 264 P.3d 1033 (2011), *petition for review filed* December 5, 2011, that the rape statute did not create an alternative means so as to require evidence of penile penetration, finger penetration, *and* penetration by some other object to convict a defendant of rape:

"The statutes actually define a single means of committing rape; it is nonconsensual penetration of the female genitalia with something. The definitional statute then characterizes the instrumentality as a finger, the male sex organ, or an object. All of those terms, strictly speaking, may be unnecessary. If they were omitted, sexual intercourse would be defined as penetration of the female sex organ. Anything used to accomplish the act of penetration would meet that definition. . . .

". . . The wording reflects verbal redundancy rather than differing ways or alternative means of committing a criminal offense. In short, the definition of sexual intercourse cannot reasonably be viewed as creating alternative means of committing rape."

The *Schreiner* court acknowledged that some degree of redundancy is acceptable in criminal statutes in the interests of comprehensibility, completeness, and giving fair notice of the criminalized conduct. 46 Kan. App. 2d at 785.

The *Schreiner* decision has been followed by several other panels of this court. See, *e.g.*, *State v. Boyd*, 46 Kan. App. 2d 945, 949, 268 P.3d 1210 (2011), *petition for review filed* January 23, 2012; *State v. Martinez*, No. 104,695, 2012 WL 1524034, at *4-5 (Kan. App. 2012) (unpublished opinion), *petition for review filed* May 29, 2012; *State v. Jones*, No. 105,480, 2012 WL 1072761, at *2-3 (Kan. App. 2012) (unpublished opinion), *petition for review filed* April 19, 2012; *State v. Brooks*, No. 105,358, 2012 WL 309075, at *3-4 (Kan. App. 2012) (unpublished opinion), *petition for review filed* February 27, 2012; *State v. Ochoa*, No. 104,746, 2012 WL 98508, at *6 (Kan. App. 2012) (unpublished opinion), *petition for review filed* February 6, 2012. Additionally, this court has ruled that explanatory definitions in jury instructions do not create an alternative means for committing a crime. See *State v. Waldrup*, 46 Kan. App. 2d 656, 668-69, 263 P.3d 867 (2011) (holding jury instruction's explanatory definition of sale of cocaine did not create alternative means of committing crime because the broad definition of the term "sale" did not reasonably confuse the jury about what criminal conduct the State had to prove to find defendant guilty), *petition for review filed* November 16, 2011. We agree with these previous opinions that the *Schreiner* decision is well reasoned and highly persuasive. The State wasn't required to present evidence that E.A. was penetrated by both Parker's finger and his penis for him to be convicted of rape. Nor did the State have to

present evidence that Parker tried—but failed—to achieve penetration with both his finger and his penis for him to be convicted of attempted rape.

V. *There Was Sufficient Evidence to Support Parker's Conviction for Aggravated Burglary.*

Aggravated burglary is the knowing entry into or remaining within, without authority, "any building, manufactured home, mobile home, tent or other structure . . . in which there is a human being, with intent to commit a felony, theft or sexual battery therein." K.S.A. 21-3716. Parker contends that E.A.'s hospital room was not a "structure" under the aggravated-burglary statute.

We once again look at the evidence in the light most favorable to the State. To the extent we must interpret the aggravated-burglary statute, we do so independently, without any required deference to the district court. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

Parker relies primarily on *State v. Hall*, 270 Kan. 194, 14 P.3d 404 (2000), in which the defendant's conviction for burglary from an unlocked stockroom inside a K-Mart store was reversed because the defendant was authorized to enter the store. Similarly, Parker argues that he was authorized to enter the hospital, which was open to the public.

Two other cases suggest a different result here. The closest precedent to our case is an unpublished decision, but it is factually similar to our case. In *State v. Hauser*, No. 95,744, 2007 WL 2819883 (Kan. App. 2007) (unpublished opinion), *rev. denied* 286 Kan. 1192 (2008), the defendant entered a tanning salon asking about a tanning package for his girlfriend. He then asked to use the bathroom but instead went into a tanning booth occupied by a woman. The victim noticed him watching her, and the man then attempted to take the victim's folded-up clothing and wallet but fled after she began shouting. Our court noted that the tanning room was temporarily " 'leased' " to occupants and was designed to exclude others from entry and protect the security and privacy of the occupant. Thus, our court held that the tanning booth was

a structure capable of being burglarized. 2007 WL 2819883, at *2-3.

Another case of note is *State v. Vinyard*, 32 Kan. App. 2d 39, 78 P.3d 1196 (2003), *rev. denied* 277 Kan. 927 (2004). In it, the defendant entered a Dillard's store within a shopping mall to steal a CD player and sunglasses. The defendant had previously been banned from entering that particular store but not the mall. Our court held that when someone enters "a business that is completely enclosed and secured separate and distinct from the other businesses in a public mall, the individual is entering a building as described in K.S.A. 21-3716." *Vinyard*, 32 Kan. App. 2d at 42-43.

E.A.'s hospital room shared nearly all the characteristics of the tanning booth in *Hauser*. The hospital room had a door, was temporarily leased to occupants, was designed to exclude others, and was intended to protect the occupant's privacy and security. Just as the defendant in *Hauser* wasn't authorized to enter the tanning booth even though he'd made permissible entry to the business and had permission to use its bathroom, Parker wasn't authorized to enter E.A.'s third-floor patient room even though the public could enter the hospital building. As in *Vinyard*, an individual patient room is enclosed and distinct from the public areas of the hospital. And unlike *Hall*, where there are normally no people who occupy a K-Mart stockroom, a patient usually occupies a hospital patient room.

Parker entered a patient room in which E.A. resided, albeit temporarily. Thus, Parker entered a structure as defined in K.S.A. 21-3716.

## VI. *The District Court Did Not Err in Ruling the DNA Swabs Taken from Parker's Hands Were Admissible.*

Parker sought to exclude the DNA evidence obtained from the swabs taken from his hands shortly after his arrest based on his argument that taking the swabs violated his constitutional rights. Of course, the Fourth Amendment to the United States Constitution (applied to the states under the Fourteenth Amendment) prohibits unreasonable searches, and warrantless searches are considered unreasonable unless a recognized exception permits them.

*State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010), *cert. denied* 131 S. Ct. 2114 (2011). Here, the State argues the recognized exception for probable cause plus exigent circumstances. The State must show that its agent had probable cause to search and that the immediate search was justified by exigent circumstances, which exist when the officer "reasonably believes there is a threat of imminent loss, destruction, removal, or concealment of evidence." *State v. Fewell*, 286 Kan. 370, 377, 384-85, 184 P.3d 908 (2008).

There can be no doubt that the officer here had probable cause to believe that Parker had committed a felony. E.A. had told officers what had happened, and a nurse had found Parker on E.A.'s bed with his pants down. So the only question is whether there were exigent circumstances to take swabs for DNA evidence from Parker's hands.

An officer testified that even though Parker was handcuffed, he could have wiped his hand on his pants before officers could get a warrant, potentially destroying fragile DNA evidence. Parker suggests that officers instead could have monitored him for however long it took to locate a judge and get a search warrant. But even a momentary slipup might result in the destruction of evidence. The district court properly concluded that the officer reasonably believed there was a threat of imminent loss or destruction of evidence if the swabs weren't taken immediately. The district court thus properly denied the motion to suppress the DNA evidence and properly admitted that evidence.

We find that the district court did not abuse its discretion here, and we have found no other errors on appeal. The district court's judgment is therefore affirmed.