NOT DESIGNATED FOR PUBLICATION

No. 117,038

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JERRY ARMSTRONG,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed May 25, 2018. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., BUSER and SCHROEDER, JJ.

BUSER, J.:  This is Jerry Armstrong's direct appeal of his convictions for property crimes. On appeal, he contends the State's fingerprint examiner's testimony was inadmissible hearsay and his burglary convictions are multiplicitous. Upon our review, we find no reversible error and affirm the convictions.


FACTUAL AND PROCEDURAL BACKGROUND

Scott Pierpoint lived in an apartment complex in Wichita. His garage was detached from the apartment complex, but it was one of a series of garages attached to

1

each other. In particular, Pierpoint's garage shared a common wall with a garage belonging to Sharon Wiles.

On October 26, 2015, Pierpoint opened his garage and discovered that it had been burglarized. The common wall separating Pierpoint's garage from Wiles' garage had a sheet of plywood removed which created a hole in the wall. Two coolers had been taken from a shelf, filled with gasoline, and placed on the floor next to a car battery. Pierpoint then observed that his vehicle's battery was no longer in the engine compartment, and some engine hoses had been cut.

Pierpoint called the police and Officer Chris Nixon investigated the crime scene. Officer Nixon observed a layer of dust on Pierpoint's vehicle, but he noticed some areas where the dust had been disturbed. From these areas, Officer Nixon lifted several latent (unknown) fingerprints. Based on the officer's investigation, the burglar was believed to have entered Wiles' garage, removed the plywood which created a hole in the common wall, and then entered Pierpoint's garage.

Wiles was contacted. She advised that, in addition to the overhead garage door, there was a door that allowed her access to the garage from a patio located behind her apartment. Wiles believed this door to the garage was probably left unlocked.

Inside Wiles' garage, the plywood on her side of the common wall had also been removed to create a hole into Pierpoint's garage. Officer Nixon discovered an unknown backpack in Wiles' garage. Inside the backpack was a vase belonging to Pierpoint, as well as gloves and various tools. After inventorying her garage, Wiles believed a hammer and a measuring tape were missing.

As part of the police investigation, Mindy Craig, a fingerprint examiner for the Wichita Police Department, examined the latent prints collected by Officer Nixon. Craig

submitted the latent prints to a computer database which identified the 10 best potential matches. Armstrong was listed as the top potential match. After comparing three latent prints collected by Officer Nixon to Armstrong's known fingerprints, Craig identified the latent prints as coming from the index, middle, and ring finger of Armstrong's left hand.

Armstrong was charged with two counts of burglary, theft, attempted theft, and criminal damage to property. The two counts of burglary related to the separate entries into Pierpoint's garage and Wiles' garage.

Following a jury trial, Armstrong was convicted of all the charges except theft. He was sentenced to 42 months in prison and ordered to pay $3,039.58 in restitution. Armstrong appeals.

ADMISSIBILITY OF FINGERPRINT TESTIMONY

On appeal, Armstrong contends the district court erred on two occasions by erroneously admitting hearsay evidence that an unnamed fingerprint examiner confirmed Craig's expert opinion that the latent prints found at the crime scene matched his known prints. The State counters that Armstrong failed to preserve the hearsay issue. Alternatively, the State argues that any erroneous admission of hearsay evidence was harmless error. Of note, the State does not address, let alone argue, that the challenged evidence was not hearsay.

At trial, Craig testified that three latent prints matched the known prints of the three corresponding fingers on Armstrong's left hand. Craig opined: "I do not have a doubt that these latent prints were made by Jerry Wayne Armstrong." The State then asked Craig whether she had another qualified person compare the fingerprints. Craig replied that she provided another examiner who worked for the sheriff's office with the

3

latent prints and the known fingerprints of Armstrong. The following exchange occurred on direct examination:

"[THE PROSECUTOR:]  And did she confirm your findings?
"[CRAIG:]  She did.
"[THE PROSECUTOR:]  Were there any prints—
        "[DEFENSE COUNSEL:]  Objection, Your Honor. Hearsay.
        "[THE COURT:]  Overruled."

Later, on redirect examination, the State returned to the subject of the other fingerprint examiner confirming Craig's findings:

"[THE PROSECUTOR:]  And your opinion is corroborated by a second set of human eyes as well?
"[CRAIG:]  Yes."

Armstrong did not object to this question or testimony.

*Whether the Evidentiary Issue was Preserved for Appellate Review*

We begin our analysis by addressing whether this evidentiary issue was preserved for appellate review. In order to preserve an evidentiary issue on appeal, a party must make a timely and specific objection to the admission of evidence during trial. *State v. Gaona*, 293 Kan. 930, 956, 270 P.3d 1165 (2012). Under K.S.A. 60-404:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

4

One purpose of the contemporaneous objection rule is to give the district court the opportunity "to conduct the trial without exposure to tainted evidence, thus avoiding possible reversal." *State v. Spagnola*, 295 Kan. 1098, 1102, 289 P.3d 68 (2012).

Kansas courts have explained that "only an objection raised at the time the evidence is offered satisfies the contemporaneous objection requirement." *State v. Daniels*, 28 Kan. App. 2d 364, 365, 17 P.3d 373 (2000). For example, as a general rule, when a defendant does not object to witness testimony until the close of the State's case, the objection is not contemporaneous. 28 Kan. App. 2d at 365. Moreover, in *State v. Jones*, 306 Kan. 948, 960, 398 P.3d 856 (2017), our Supreme Court held that a defendant's objection to a recorded telephone call was not contemporaneous when the defendant objected after the recording was played and the prosecutor began asking a witness about the recording's significance. The Supreme Court in *Jones* reasoned that defendant's "failure to object until after the recording was played defeats a purpose of the contemporaneous objection rule, to prevent the jury from hearing impermissible evidence." 306 Kan. at 960.

In *Khalil-Alsalaami v. State*, 54 Kan. App. 2d 235, 257, 399 P.3d 264 (2017), however, our court held that an objection to a line of questioning which infringed upon the defendant's right to silence was timely even though the objection came after several unconstitutional questions were asked and answered. Our court reasoned that the objection was "sufficiently contemporaneous to the questions that the district court was able to consider whether the prosecutor committed an error at a time when the mistake could have been corrected." 54 Kan. App. 2d at 257. Our court concluded that an objection to a line of questioning, after more than one objectionable question has been asked, may still preserve the evidentiary issue for appeal. 54 Kan. App. 2d at 257.

Turning to this case, Armstrong raised a hearsay objection after Craig first testified on direct examination that another examiner confirmed her expert opinion. This

objection came after Craig's response to the prosecutor's question about the other examiner's verification of Craig's opinion, when defense counsel interrupted the prosecutor's next question. While the objection was not truly contemporaneous, the district court was able to promptly overrule it within moments after the challenged statement was made. Under these unique circumstances, the district court had the opportunity to rule and, if it had determined the testimony was inadmissible, promptly instruct the jury to disregard it. We are persuaded that Armstrong preserved for appellate review this particular hearsay objection.

Next, we consider whether Craig's claimed hearsay testimony on redirect examination was preserved for our review. Of note, on appeal, Armstrong does not address whether this second statement was preserved.

"Kansas does not follow the rule that if an earlier objection is overruled, repeated objections are not required . . . ." *McKissick v. Frye*, 255 Kan. 566, 582, 876 P.2d 1371 (1994). As a result, absent a continuing objection, "[a]n objection is waived by the failure to renew it when the question is repeated." *Cessna Aircraft Co. v. Metropolitan Topeka Airport Authority*, 23 Kan. App. 2d 1038, 1056, 940 P.2d 84 (1997).

In this case, Armstrong did not object to Craig's testimony on redirect examination that her opinion was "corroborated by a second set of human eyes." Since Armstrong did not request a continuing objection when Craig first testified about the other expert's findings on direct examination, and Armstrong failed to contemporaneously object to Craig's similar testimony on redirect examination, he waived any objection to Craig's testimony *on redirect examination* that her expert opinion was validated by another examiner.

6

*Assuming the Evidence was Hearsay, Its Admission was Harmless Error*

The State does not contest Armstrong's assertion that Craig's statement was inadmissible hearsay. Instead, the State contends that admission of this testimony was harmless error. Although we have serious doubts regarding its classification as inadmissible hearsay, because of the State's acquiescence in this issue, we will assume, without deciding, that Craig's comments on direct examination were hearsay. Accordingly, we will proceed to a harmless error inquiry.

The erroneous admission of evidence is reviewed for harmless error under K.S.A. 2017 Supp. 60-261. *State v. Perez*, 306 Kan. 655, 666, 396 P.3d 78 (2017). The harmless error analysis under K.S.A. 2017 Supp. 60-261 requires our court to determine "whether there is a reasonable probability that the error affected the outcome of the trial in light of the entire record." 306 Kan. at 666. "The State, as the party benefitting from the introduction of the evidence, has the burden of persuading the court that the error was harmless." *State v. Betancourt*, 299 Kan. 131, 144, 322 P.3d 353 (2014).

Armstrong complains that "[g]iven the importance of the fingerprint evidence to tying Mr. Armstrong to the burglary, the State cannot prove that the erroneous admission of Ms. Craig's hearsay testimony probably did not affect the verdict." In response, the State argues:

> "While defendant speculates that the reference to the other analyst would have played a significant role in the juror's minds if the jurors 'disbelieved Ms. Craig's testimony or had sufficient concerns about her methods,' it is difficult to understand how the jurors would question Craig, after hearing about her extensive training and experience, yet blindly accept the conclusion of an unidentified analyst."

It is apparent that fingerprint evidence provided the critical link in proving that Armstrong committed the property crimes charged. What effect Craig's challenged

7

testimony had in the proof of this linkage must be compared to the quantity and quality of the other fingerprint evidence admitted at trial.

At the outset, Craig's expert qualifications as a fingerprint examiner were well established. Craig testified that she had over 300 hours of training and had been a fingerprint examiner for about 17 years. She is certified as a fingerprint examiner with the International Association for Identification. During her career, Craig indicated she had testified on 50 to 100 occasions as an expert witness in court.

Craig testified that the three latent prints had sufficient detail to be evaluated and compared to known prints. In fact, she considered the detail on the latent prints to be of high quality. Craig described how she initially entered the three latent fingerprints into a computer database which, at her request, identified the 10 best potential matches. This computerized process, employing only algorithms, identified Armstrong's known fingerprints as the most likely potential match with the latent fingerprints.

Craig then began her individual examination and comparison of the prints. She described the ACE-V protocol and noted that the procedure has been found to be reliable within the field of fingerprint examination. Craig detailed her own examination which resulted in finding no points of dissimilarity between the latent and known prints. Craig testified that all three latent prints matched Armstrong's known prints. Craig then opined that she did "not have a doubt that [the] latent prints were made by Jerry Wayne Armstrong."

As discussed earlier, Armstrong did not object to Craig's testimony on redirect examination that as part of the verification process her identification opinion was "corroborated by a second set of human eyes." In short, assuming Craig's challenged testimony on direct examination was erroneous, the jury was still informed that, as part of the ACE-V protocol, another fingerprint examiner had verified Craig's identification.

8

We are persuaded there is no reasonable probability that the admission of the challenged evidence affected the verdict in this case. The testimony that another fingerprint examiner confirmed or corroborated Craig's findings was solely cumulative of her own findings. Once the jury heard on redirect examination that Craig's findings had been corroborated, the earlier testimony on direct examination that another examiner confirmed her findings added little, if any, weight to Craig's testimony. Also, there was no challenge to Craig's findings or any evidence presented that the latent prints did not match Armstrong's prints. As a result, the challenged statement, if erroneously admitted, was harmless error. See *State v. Quick*, 329 N.C. 1, 29, 405 S.E.2d 179 (1991) (finding no reversible error when a fingerprint examiner stated another corroborated his findings because the examiner gave an uncontroverted opinion identifying the print as the defendant's).

Given Craig's extensive experience, the certainty of her opinion, and the uncontested identification testimony, there is no reasonable probability the testimony that an unidentified examiner verified Craig's fingerprint identification affected the outcome of the trial. We conclude the State has met its burden to show that any error was harmless.

WHETHER THE BURGLARY CONVICTIONS ARE MULTIPLICITOUS

Next, Armstrong claims that the two burglary convictions are multiplicitous. Armstrong contends that because the burglar entered a single building and then went from one interior garage to another, he could only be convicted of one burglary. Armstrong raises this issue for the first time on appeal. However, our court considers multiplicity challenges for the first time on appeal in the interest of justice and to prevent a denial of fundamental rights. *State v. Davis*, 306 Kan. 400, 420, 394 P.3d 817 (2017).

9

Our standard of review provides: "Questions involving multiplicity are questions of law subject to unlimited appellate review." *State v. Belt*, 305 Kan. 381, 407, 381 P.3d 473 (2016).

"Multiplicity is the charging of a single offense in more than one count of a complaint or information." *State v. Harris*, 284 Kan. 560, Syl. ¶ 1, 162 P.3d 28 (2007). "The principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights." *State v. Thompson*, 287 Kan. 238, 244, 200 P.3d 22 (2009).

The overarching inquiry in determining whether convictions are multiplicitous is whether the convictions were for the same offense. *State v. Schoonover*, 281 Kan. 453, 496, 133 P.3d 48 (2006). There are two components to this inquiry, both of which must be met for the convictions to be multiplicitous: "(1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one?" 281 Kan. at 496. Here, the State does not contest that the offenses were part of the same conduct. Thus, the focus of our inquiry is on the second component—whether the conduct constituted one or more offenses by statutory definition.

To determine whether Armstrong's conduct constituted one or two offenses, the unit of prosecution test is employed because the burglary convictions are for multiple violations of a single statute. 281 Kan. at 497. Under the unit of prosecution test, the court asks: "How has the legislature defined the scope of conduct which will comprise one violation of the statute? The statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each allowable unit of prosecution." 281 Kan. at 497-98.

10

In this case, Armstrong was convicted of two counts of burglary under K.S.A. 2015 Supp. 21-5807(a)(2), which defines burglary as "without authority, entering into or remaining within any . . . building, manufactured home, mobile home, tent or other structure which is not a dwelling, with intent to commit a felony, theft or sexually motivated crime therein." Of note, the jury instructions clarified that one count of burglary was based on Armstrong's entry into Wiles' garage, which was described as a "building that was not a dwelling." The second count of burglary was based on the entry into Pierpoint's garage, which was similarly referred to as a "building that was not a dwelling."

Because the plain language of the statute refers to any building, this court has previously held that the Legislature intended that a person can be charged separately for each building that is entered and burglarized. See *State v. Jones*, No. 113,876, 2017 WL 4323114, at *9 (Kan. App. 2017) (unpublished opinion). Therefore, as Armstrong recognizes, the ultimate question is whether each individual's garage contained in a free-standing structure is a building for the purposes of the burglary statute.

Armstrong claims that both garages were part of the same building and asserts that a burglary only occurs by an unlawful "entry into the building, rather than a subpart of that building." Armstrong reasons that the only entry into a building occurred when the burglar entered Wiles' garage, and the additional entry into Pierpoint's garage was not an entry into a building because it was a subpart of the larger structure. In support of his argument, Armstrong relies on *State v. Hall*, 270 Kan. 194, 14 P.3d 404 (2000). In *Hall*, the court held that a defendant was not guilty of burglary when he lawfully entered a K-Mart store, stole items, and then made an unauthorized entry into the store's stockroom. 270 Kan. at 202.

Our court has previously refused to interpret *Hall* to stand for the proposition that a building for the purposes of the burglary statute may not include an internal

11

demarcation within a larger structure. See, e.g. *State v. Vinyard*, 32 Kan. App. 2d 39, 41-42, 78 P.3d 1196 (2003). Indeed, we have repeatedly held that leased portions of a larger structure that are separately enclosed and secured are separate buildings as the term applies in the burglary statute. *Jones*, 2017 WL 4323114, at *9 (listing cases); see also *State v. Parker*, 48 Kan. App. 2d 68, 84-85, 282 P.3d 643 (2012) (hospital rooms are temporarily leased to patients and protect occupants' privacy and security, therefore entry into a room with intent to commit a crime is sufficient to support burglary charge, even if defendant did not unlawfully enter into the hospital); accord *Vinyard*, 32 Kan. App. 2d at 42-43.

For example, in *Vinyard*, our court held that a defendant committed burglary when she unlawfully entered a Dillard's store from the mall entrance to steal merchandise. 32 Kan. App. 2d at 42-43. We distinguished *Hall* because the stores in the mall were leased to different tenants and each store was "completely enclosed and secured separate and distinct from the other businesses in the mall." *Vinyard*, 32 Kan. App. 2d at 42. As a result, our court concluded that each business in the mall was a distinct building for the purposes of the burglary statute. 32 Kan. App. 2d at 42-43.

Here, each garage which was leased had its own garage door and was completely enclosed by walls which were intended to exclude others from entry and protect the security of each lessee's separate property. Because each garage had its own space and was secured separately from the other garages within the structure, each of the individual garages was a distinct building. Accordingly, the burglary charges were not multiplicitous and the district court did not err by allowing each unit of prosecution to be presented to the jury to determine whether Armstrong was guilty of two counts of burglary.

Affirmed.